CHARLES COLLINS

*v.*

THE PEOPLE OF THE STATE OF ILLINOIS.

*Opinion filed February 21, 1902.*

1. RECORD—*indictment is part of the record as written up by the clerk.* An indictment is properly preserved in the record for inspection by a court of review if it is contained in the record as written up by the clerk.

2. CRIMINAL LAW—*effect where copy of the indictment furnished before arraignment is imperfect.* If, after arraignment and plea, the court learns that the copy of the indictment furnished before arraignment is imperfect, it is not error to set aside the arraignment and plea and allow a true copy of the indictment to be furnished to the accused, after which he is arraigned and allowed to plead.

3. SAME—*when instruction as to a reasonable doubt is not prejudicial.* An instruction that a reasonable doubt means a serious, substantial, well-founded doubt, and that "if, after carefully considering all the evidence in the case, you can say, 'We are satisfied of the truth of the charge,' then you are satisfied beyond a reasonable doubt, within the meaning of the law," is not erroneous although not to be approved, and is not prejudicial if, under the whole evidence, there is no reasonable doubt of the guilt of the accused.

4. SAME—*not error to refuse instructions if others given cover the subject.* It is not error to refuse instructions if others given at the request of the party cover the subject matter of the ones refused.

5. SAME—*when statement of juror is not ground for setting aside a verdict.* A verdict finding the accused guilty of the crime of shooting his wife should not be set aside because of an affidavit showing that soon after the crime one of the jurors said, in the presence of the affiant, that "a man that would shoot his wife without cause ought to be strung up."

6. SAME—*what evidence not incompetent.* If, on the trial of a man for shooting his wife, it is claimed by the defense that he was helplessly drunk, it is not improper to allow witnesses for the People to testify that they had made a test of the revolver, offered in evidence as one with which the shot was fired, as to the number of pounds pressure on the trigger it would require to discharge it.

7. SAME—*what evidence is properly excluded from jury.* If a witness for the People is examined and cross-examined as to all his knowledge of the homicide from the time he heard of it until the accused was taken to jail, it is not error to exclude from the jury his testimony, given as a witness for the defense, that the accused appeared dazed after he was in jail, and that upon his being told that he had killed his wife he called the witness a liar.

8. SAME—*when court is justified in refusing to allow witness to express an opinion.* In a trial for murder the court is justified in refusing to permit the thirteen-year-old daughter of the accused to express an opinion as to whether her father's condition upon the night of the crime was such as to render him unconscious of his acts.

9. DYING DECLARATIONS—*declaration must be made under belief of impending death.* The belief that death is imminent and sure to follow gives to the statements of one in such frame of mind the sanctity of an oath, but until the evidence discloses such a belief the declarations are no more competent than the statements of any other unsworn witness.

10. APPEALS AND ERRORS—*record must disclose objections and exceptions to court's remarks.* To entitle the Supreme Court to consider alleged improper remarks of the court during the trial, the record must disclose objections overruled and exceptions taken.

WRIT OF ERROR to the Circuit Court of Warren county; the Hon. JOHN J. GLENN, Judge, presiding.

ALMON KIDDER, C. A. MCLAUGHLIN, and B. F. JONES, for plaintiff in error.

H. J. HAMLIN, Attorney General, (LOUIS H. HANNA, State's Attorney, and JAMES W. CLENDENIN, of counsel,) for the People.

Mr. JUSTICE RICKS delivered the opinion of the court:

This case comes before us on a writ of error to the circuit court of Warren county upon the judgment entered upon a verdict finding the plaintiff in error guilty of the crime of murder, and fixing his punishment at a life sentence in the penitentiary at Joliet.

The record discloses that Charles Collins, the plaintiff in error, resided at Monmouth with his wife, Hattie A. Collins, and his three daughters, aged, respectively, eight, ten and thirteen years; that he had resided there for many years, and of recent years had become a prey to the excessive use of intoxicating liquors; that this habit had caused him to lose an important business position, and at the time of the commission of the crime charged he was the keeper of a small restaurant. The evidence shows that he had become so much a slave to drink that he was almost daily intoxicated, frequently being put to bed in the daytime and taken to his home by his brother and others of evenings. On the 31st of December, 1900, the family arranged to have egg-nog in the evening, and two or three parties were invited to be present and participate in drinking it. Besides his own family, a young woman named Minnie Ackerman had a room in his house, and on the evening of the tragedy had a man visiting her, named Harry Wilson. There were also present a Mrs. Moore, a young man named Harry Richie, and a little girl twelve or thirteen years old, named Nina Weir. Plaintiff in error came home early in the evening and the company gathered in to drink the egg-nog, and conversation was carried on until about nine o'clock, when Harry Richie and Mrs. Moore left and the children of plaintiff in error, and Nina Weir, who was to remain over night with them, retired to their room, which adjoined the sitting room in which the party had spent the evening. Harry Wilson and Minnie Ackerman were in the latter's room, which also adjoined this sitting room. Plaintiff in error and his wife, Hattie, were left alone in the sitting

room. The evidence showed that he had been carrying for some time a Smith & Wesson revolver in his overcoat pocket, and that when Harry Richie started to go away the plaintiff in error put on his overcoat and expressed an intention of accompanying him up-town, but that his wife dissuaded him and prevailed on him to remain at home. When the children left the room to go to bed the plaintiff in error's wife was sitting upon his lap, and up to that time they had been apparently in cordial and pleasant relation. Shortly after the children had retired, plaintiff in error's wife was heard to cry out, "Harry!" which all seemed to understand to be a call for Harry Wilson, who was in the room with Miss Ackerman. This call attracted the attention of the children, and they got out of bed and one or two of them came to the door, and opening it saw plaintiff in error's wife was struggling to get away from him and he was speaking harshly to her. After some struggling she was released and it was observed that plaintiff in error's nose was bleeding. His wife got a paper to prevent the blood from falling to the carpet and warned him to not get it upon his clothing. He seemed to be angered and used vile language towards his wife, calling her vile and obscene names, and the testimony shows that she picked up a pair of scissors, took the small end in her hand and struck him across the forehead with the handle; that he still continued to abuse her and she went out of the room into the room where the children were, where she remained but a minute or two and came back to the door and into the room where plaintiff in error was. They again engaged in conversation, when plaintiff in error, with his revolver in hand, said to his wife, "If you stand there another minute I will shoot you," and she replied, "I dare you." Just as she made that reply plaintiff in error fired the revolver and struck his wife in the stomach, the bullet passing through the stomach and liver and other parts, and produced a wound from which she died on the third of January, 1901.

Mrs. Collins, when this shot struck her, gave a scream and entered the room of Miss Ackerman, saying to her and Wilson, who was there, "Charley has shot me," and requested Wilson to go for a doctor. Wilson at once started, there being an outside door leading from Minnie Ackerman's room, and she accompanied him to the door, and as she turned she observed plaintiff in error coming into her room, and said to him, "What did you do?" and plaintiff in error, having the pistol in his hand, raised it and said, "I will shoot you too."

On the 16th of January the indictment charging the plaintiff in error with murder was returned by the grand jury of Warren county. Plaintiff in error having no means to employ counsel, the court appointed Almon Kidder, C. A. McLaughlin and B. F. Jones to defend him. On the 18th of January counsel for the plaintiff in error moved to quash the indictment. This motion was overruled and the cause was set for trial on the 21st day of January. In the meantime plaintiff in error had been furnished with what purported to be a copy of the indictment, but which, it is conceded, was defective or imperfect, and being arraigned, entered his plea of not guilty. Before entering upon the trial on the 21st of January, the fact that the copy of the indictment was not correct was brought to the attention of the court, and he set aside the order of arraignment and plea and so much of the record as showed that a true copy of the indictment had been furnished, and allowed the State's attorney to serve plaintiff in error with a true copy. Plaintiff in error was again arraigned and entered his plea of not guilty, and the trial was proceeded with. On the 23d day of January the jury was empaneled and a verdict was returned the 26th.

At the close of the evidence on the part of the People counsel for plaintiff in error asked for two and one-half hours' time to consult with their witnesses before beginning the introduction of evidence on the part of

plaintiff in error, but the court refused the request and required that the trial be proceeded with. Upon the coming in of the verdict plaintiff in error made his motion for a new trial, insisting that the court erred in the admission and exclusion of evidence, the giving of instructions and the refusal of instructions on behalf of the plaintiff in error; that the verdict was against the law and the evidence, and that one of the jurors, Jerome Johnson, was prejudiced against him and had formed and expressed an opinion before he was taken as a juror, and because other jurors had formed and expressed opinions before being selected as such jurors; also upon the further ground that the State's attorney had been allowed to make improper remarks in his closing argument. The court took this motion under consideration, after argument, and it was overruled. The plaintiff in error then moved in arrest of judgment, assigning as grounds therefor the refusal of the court to quash the indictment; the overruling of the motion for a new trial; the failure to furnish the plaintiff in error with a copy of the indictment, and alleging that the original indictment had been much altered since it had been returned into court. This motion was also overruled and judgment and sentence entered.

The plaintiff in error now assigns thirteen grounds of error, a number of which he has paid no attention to in his brief or argument and is deemed to have abandoned them. The errors insisted upon are the failure to furnish the plaintiff in error with a copy of the indictment; the giving of certain instructions for the People and the refusal of one on the behalf of plaintiff in error; that the jurors C. G. Peterson and Jerome Johnson were not qualified jurors to serve in that case because they had formed and expressed opinions of the guilt of the plaintiff in error; that the court made improper remarks in his rulings during the trial, and that certain testimony was excluded that should have been admitted and certain other

testimony admitted that should have been excluded, and the alleged improper remarks made by the State's attorney in the closing argument.

We have examined the indictment in this case and find no error in the refusal of the court to quash it or any count of it. While some of the counts are awkwardly drawn, each of them contains all the elements, and in sufficient legal language and form, to properly charge the crime of murder. The Attorney General contends that we have no right to look to the indictment, as it is not contained in the bill of exceptions. It is, however, incorporated in the record as made by the clerk, and, we think, properly so. *McKinney* v. *People*, 2 Gilm. 540.

Counsel for the plaintiff in error urge that by failure to furnish the plaintiff in error with a true copy of the indictment before the arraignment and pleading he was deprived of some right. They have not pointed out what right he was deprived of, nor have they shown, or attempted to show, that he was in any manner injured or his defense in any degree impaired thereby, nor do we see how they could do so. Before he was put upon his trial, and so that he might not be prejudiced for want of a true copy, all orders affecting him, theretofore entered, were set aside and he was then served with a true copy, and again came before the bar and entered his plea of not guilty. It is true that the statute provides that he shall be furnished with a copy of the indictment and list of witnesses and jurors before his arraignment. It is also true that a copy, though not a perfect one, was furnished him and before the trial had begun or any steps taken in it. The fact that the copy was defective having been brought to the attention of the court, such orders were made that plaintiff in error was placed in the same position as though the indictment had just been returned against him, and the record shows that all the formal requirements were then complied with. It was but an irregularity. It was not error, nor was it anything that

could in any degree prejudice the rights of the plaintiff in error.

The only instructions complained of are No. 11, that was given by the court at the request of the People, and No. 1, that was refused to plaintiff in error. The given instruction was as follows:

"You are further instructed that the term 'a reasonable doubt,' as used in law, means a serious, substantial and well-founded doubt. It does not mean the mere possibility that there may be a doubt. It must be such a doubt or such uncertainty of mind as that if interposed in the graver transactions of life it would cause a prudent man to hesitate and say, 'I am not satisfied.' You are not to go outside of the evidence and hunt up doubts, nor imagine the possible existence of things or conditions not proven by the evidence in the case. If, after carefully considering all the evidence in the case, you can say, 'We are satisfied of the truth of the charge,' then you are satisfied beyond a reasonable doubt, within the meaning of the law."

It is insisted that this instruction is not a definition of the term "reasonable doubt" alone, but such an argument upon the subject of reasonable doubt as would be calculated to dispel from the mind of a juror the right to entertain any doubt. It is likened to the instruction in *Dunn* v. *People,* 109 Ill. 635, which was condemned by this court. There is a strong similarity in these instructions, and we regard the instruction not only as unnecessarily prolix, but somewhat subject to the criticism that it is argumentative; but we do not find in it an erroneous statement of the law, and do not think, from a review of all the evidence in this case, that it could have been hurtful to plaintiff in error. We do not approve of this class of instructions, but we do not regard the giving of this as reversible error, for the reason that we feel, taking all the evidence into consideration, there was no room for a reasonable doubt of the guilt of the plaintiff in error.

194—33

Plaintiff in error complains of the refusal to give but one of the instructions asked on his behalf. That instruction was as follows:

"You are instructed that if you believe, from the evidence, that the shooting alleged to have been done by the defendant was done at a time when the defendant was affected with and laboring under an attack of that disease or malady and a brief or temporary madness or insanity, the result of protracted hard drinking of spirituous liquors for several weeks immediately preceding of the act, and that he was thereby rendered positively unconscious of what he was doing, it would constitute, in law, a complete and entire defense to the whole prosecution, and he should be acquitted."

We do not think there was error in the refusal of this instruction. There was no evidence to support an instruction based upon the theory that there had been any insanity on the part of plaintiff in error of any duration. The force of the instruction is, that if plaintiff in error was laboring under temporary madness or insanity, which rendered him positively unconscious of what he was doing when he committed the act, it would constitute, in law, a complete defense. This same point was covered by instructions 3, 5, 7, 9 and 15 that were given to the jury at the request of the plaintiff in error, in which the law upon the subject of drunkenness as an excuse for crime is stated more favorably for plaintiff in error than he was entitled to have it. (Hurd's Stat. 1899, chap. 38, par. 291.)

One of the jurors, Jerome Johnson, on his *voir dire* stated that he had talked with a number of persons about the case, and frequently, but that he had formed no opinion as to the guilt or innocence of the accused; stated that he talked to no one who knew about the case, but that the talk was that the accused did the shooting. After the trial, and upon the motion for new trial, plaintiff in error presented the affidavit of one Albert R. Smith, who stated that prior to the time said juror was sum-

moned he stated to the affiant that "a man who would shoot his wife, as Collins had, ought not to have a trial in court, but ought to be taken out and hung;" also the affidavit of C. E. Waddell and F. Harmon, that soon after the homicide the juror said in their presence, "a man that would shoot his wife without cause ought to be strung up." Smith, in his affidavit, fixed the place of the conversation as being at Gillmore's coal bank. The juror made a counter-affidavit, in which he denied that he had any conversation upon the subject with Smith, and that the remark attributed to the juror was made by one John Johnson, a brother of the juror, in a conversation between Smith and John Johnson and other parties, in which the juror Johnson had taken no part. Smith also made an affidavit in which he denied that the juror Johnson had used the language attributed to him in the first affidavit by Smith, and stated that the language used in his affidavit was used by John Johnson, and not by the juror. John Johnson's affidavit was also introduced by the People, in which he said that it was he that had used the language attributed to the juror. J. R. Grier, one of the attorneys for the People, L. H. Hanna, the State's attorney, and Marshall Sloats, all made affidavits on behalf of the People, in which they stated that they had each had conversations with Waddell and Harmon, and that they stated they were not able to state or re-call anything that Johnson said in any conversation upon the subject of that homicide. We think the matters set up in the first Smith affidavit were fully disproven, and that the matters stated in the Waddell and Harmon affidavits could be no ground for challenge if they had appeared in the examination of the juror. They were but the statements of the average man in discussing, in an abstract manner, the killing of a wife by her husband. In them there was no expression of opinion or contention as to the guilt or innocence of the plaintiff in error. That a juror should believe that a man who would shoot his wife

without cause should be strung up is not a disqualifying condition of mind or attribute of man. Good citizens do, and should, condemn crime, and should favor the infliction of severe punishment upon the man who kills his wife without cause.

The juror C. G. Peterson stated that he was a farmer; was fifty-eight years of age; had a wife and five children, and that he had read about the case in the *Atlas* and *Review*, two local papers, but stated that he had not talked with anybody about the matter and had not formed any opinion as to the guilt or innocence of the plaintiff in error. On a motion for a new trial plaintiff in error offered the unsigned affidavit of one Carl Swan, in which he said that shortly after the homicide he went to the juror's home, and, the matter of the tragedy being discussed, the juror declared, "Hanging would be too good for him," or words to that effect. The juror and his son, Henry, were both present at the alleged conversation, and counter-affidavits were made by each of them, in which they denied that the juror used any language, either in words or import, such as attributed to him, but that the subject was introduced by Swan, and the language quoted by Swan, attributed to the juror, was used by Swan himself in talking to them. The court, we think, under this showing, properly refused to grant a new trial upon the grounds of the prejudice of the jurors.

The next contention is, that the court, in one of his rulings upon the admissibility of evidence, stated that the evidence was admissible, as it might show malice. It is unnecessary to discuss this contention as no exception was taken, at the time, to the remark of the court, nor was it insisted upon as a ground for a new trial, and cannot now be relied upon in this court. Through some oversight of counsel for plaintiff in error an exception is shown on the abstract, but on going to the record none appears.

Complaint is made that witnesses were allowed to testify, on the part of the People, that they had made

a test of the revolver offered in evidence as belonging
to plaintiff in error and the one with which the evidence
tended to show the shooting was done, as to the number
of pounds pressure required to pull the trigger, and upon
which the People based some sort of an argument, as it
took such a number of pounds, that a man who was help-
lessly drunk, as it was being contended that plaintiff
in error was, could not have pulled the trigger.   We do
not regard that as error.   The evidence, we think, was of
very little probative weight,.but whatever it did prove
was competent evidence.

It is next urged that it was error to refuse to grant
the time of two and one-half hours to consult with the
witnesses for plaintiff in error at the close of the Peo-
ple's case in chief, and it is said that the trial of plaintiff
in error was railroaded or hurried unreasonably.   We do
not think so.   From the record it appears that he was
indicted on the 16th. He was put upon his trial the 21st.
On the 16th three lawyers were appointed to defend him.
The trial and the selection of the jury lasted six days,
and we think, in view of the number of witnesses, that
there was reasonable and proper deliberation.   More than
that, this objection was not made at the.time of the mo-
tion for a new trial nor on the motion in arrest of judg-
ment, and we would be precluded from reversing the case
even if it were error.

It is next insisted that it was error in the court to
exclude from the jury a conversation had between the
plaintiff in error and one Webb Morrison, after plaintiff
in error had reached the jail.   Morrison was a witness in
chief for the People, and was examined and cross-exam-
ined as to all his knowledge from the time he learned of
the homicide until the plaintiff in error was taken to the
jail, and was fully cross-examined by counsel for plain-
tiff in error. He was called as a witness also by plaintiff
in error, and it was desired to prove by him that after
plaintiff in error was in jail he appeared dazed, and when

told that he had killed his wife called Morrison a liar. This evidence was not part of the *res gestœ,* nor do we see how what transpired after he was in the jail could explain what he did at the time of the alleged shooting.

Complaint is also made that Gertrude Collins, a daughter of plaintiff in error, who was aged thirteen years, was not allowed to give her opinion as to the mental condition of her father at the time of the homicide. She was a witness on the part of the People, was an eye-witness to the shooting, and was fully examined and cross-examined. She was afterwards called by plaintiff in error and a number of questions asked her, which she was allowed to answer. She was asked this question: "Now, on the evening this shooting occurred, what do you say was your father's condition? Was it such as to render him unconscious of his acts and surroundings, or otherwise?" To this question an objection was made and sustained. She was then asked the further question: "Gertrude, from your knowledge of your father's condition upon the evening of the 31st of December last, in your judgment, what do you say?—was he conscious of his acts and surroundings?" Objection was again interposed, when the court remarked: "The court don't object to her testifying to any fact or circumstance that transpired at that time, but don't think the child has had experience or observation enough to answer the question, and the objection will be sustained." We are not able to say that the court was wrong in this matter. It is true that one does not need to be an expert to testify as to mental conditions; but here was a little girl before the court, and we are inclined to think that his judgment as to the capacity of the witness should be deferred to, as he had the witness before him, and there is nothing in the record that indicates to us that the court had any motive other than to give the defendant a fair and impartial trial.

The next contention relates to the exclusion of the alleged dying declaration of Mrs. Collins, evidence of

and relating to which was offered by plaintiff in error and to which objection was sustained. Witnesses were put upon the stand and examined in the presence of the court and in the absence of the jury, to determine whether the offered evidence could be classed as a dying declaration. The evidence wholly failed to show that Mrs. Collins at any time was advised that she was going to die or expressed her belief that she would die. She did express concern about her children in the event of her death, and asked that in case it took place certain disposition might be made of her children. The belief that death is imminent and sure to follow gives to statements of one in that frame of mind the sanction of an oath, but until the evidence discloses that state of mind such declarations are no more than the mere declarations of any other unsworn witness, and are incompetent. This rule is too well settled to require a citation of authorities.

Plaintiff in error urged as a ground for a new trial, in the court below, that the attorney for the People, in the closing argument, made improper remarks that were prejudicial to the rights of plaintiff in error, and assigns the same here as one of the grounds for reversal. No exception was taken to these remarks at the time they were made nor was the attention of the court or counsel called to them. After the trial was concluded one of the attorneys for plaintiff in error reduced what he claims were the objectionable remarks to the form of an affidavit, and assigns here as a reason for not objecting and excepting at the proper time that he supposed his objections would be overruled, as the court had so often overruled objections made by defendant's attorneys. We cannot consider this ground. The rule is well established that to entitle such matters to be urged in this court the record must show the proper objection was made and overruled and an exception taken. We do not think counsel were warranted in the assumption that any improper matter would be lightly regarded by the trial court or substantial

grounds for objection overruled. The shooting was admitted in this case, and was sought to be excused on the ground of mental irresponsibility induced by drunkenness. The record showed that this drunkenness was self-induced by plaintiff in error, and while there is evidence that he at times became very drunk and stupid from such drunkenness, the evidence is very slight in it that tends to show that at any time he was in a condition that would have been regarded as mental irresponsibility, and upon the particular night there was not room for reasonable doubt but that the defendant knew what he was doing and intended doing just what he did.

It is urged that there is also absence of motive for the act. There is evidence of an encounter between this husband and wife,—with a small amount of force, it is true, on the part of the wife, but sufficient to anger the plaintiff in error in his then condition; but the evidence abundantly shows that his wife had gotten away from him and had gone out of the room, and had entered the room again and was some distance from him, where there was no possible ground for the claim of an encounter or the pretense of sudden and uncontrollable passion, when, with what seems to us almost incredible deliberation, he advised his wife that if she stood where she did longer he would shoot her, and upon her replying that she dared him to do it, shot.

Upon the whole record we are fully convinced that this verdict and judgment were supported by the law and the evidence, and that plaintiff in error received all the mercy that he could well expect at the hands of the jury that tried him.

The judgment of the circuit court of Warren county is affirmed.

*Judgment affirmed.*