THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
DAVID RHOADS, Defendant-Appellant.

First District (5th Division) No. 80—2464

Opinion filed December 10, 1982.

James J. Doherty, Public Defender, of Chicago (John Lanahan, Assistant Public Defender, and David Barish, law student, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Joel A. Stein, and Michael J. Kelly, Assistant State's Attorneys, of counsel), for the People.

JUSTICE LORENZ delivered the opinion of the court:

Defendant David Rhoads was accused of killing his wife Vickie, and he was convicted upon retrial (see *People v. Rhoads* (1979), 73 Ill. App. 3d 288), of murder (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(a)) and arson (Ill. Rev. Stat. 1979, ch. 38, par. 20—1) after a trial by jury.

The crucial issue of fact at trial was whether defendant (who admitted that he tied up his wife and soaked her with gasoline while he was high on L.S.D.) acted with criminal intent when he started the fire that killed her, or whether, as he claimed, it was just an accident. The jury returned a verdict of guilty, and the trial court, entering judgment on the verdict, sentenced defendant to imprisonment for a term of 50 years to 50 years and a day.

Defendant now appeals from the results of his second trial, contending that the charges against him should be dismissed, or his convictions reversed, based on the following arguments:

(1) He was deprived of equal protection of the laws under the Federal Constitution (U.S. Const., amend. XIV, sec. 1), and was deprived of life, liberty or property without due process of law under the Illinois Constitution (Ill. Const. 1970, art. I, sec. 2), when the trial court refused to calculate the speedy-trial term in this case with the

new procedure established by Public Act 79—842 (codified at Ill. Rev. Stat. 1979, ch. 38, par. 103—5(f)).

(2) The trial court erred when it admitted into evidence, under the dying declaration exception to the rule against hearsay, testimony about accusatory statements made by Vickie Rhoads concerning the circumstances under which she suffered her fatal injuries.

(3) Defendant's mother-in-law was permitted to give improper rebuttal testimony.

(4) The prosecutors made improper comments during closing arguments.

(5) The evidence is not sufficient to prove defendant guilty of murder and arson beyond a reasonable doubt.

Based on the reasoning set forth below, we affirm the judgment of the circuit court. The following evidence is material to our decision.

Eighteen-year-old Vickie Rhoads suffered massive burns as the result of the fire, fueled by one or two quarts of gasoline, which occurred in her parents' home in Palatine, Illinois, at about 5:30 p.m. on July 17, 1976. A neighbor rescued her from the burning building, and it was discovered that Vickie had been hogtied with an electrical cord.

Another neighbor, David Bone, testified that after Vickie was carried out into the yard she said, "I think I am going to die. Get me to the hospital. I think I am going to die." Bone also testified that he heard Vickie say that "it was an accident."

It was stipulated that Vickie suffered burns over 80% of her body: 10% third degree burns, 50% second degree burns, and 20% first degree burns.

Dr. James Kozlowski, a physician who examined Vickie in the emergency room of Evanston Hospital within an hour of the fire, testified that after his initial examination he concluded Vickie would probably die from her burns. But she was not in much pain because the fire destroyed the nerve endings in her skin, and Dr. Kozlowski testified that Vickie was alert and lucid. He further found that she showed no signs of disorientation, shock, hallucinations, or psychic derangement.

The paramedic who worked on Vickie on the way to the hospital testified that she answered all of his questions, and was alert and lucid at all times. As part of Vickie's emergency treatment, he gave her Talwin (a pain killer) and Decadron (a drug that reduces swelling and inflammation caused by severe burns).

Although, on cross-examination, Dr. Kozlowski stated that Talwin and Decadron could cause psychic derangement, there is no evidence in the record that such symptoms could be caused by the dosages ad-

ministered to Vickie.

Dr. Kozlowski further testified that he asked Vickie what had happened, and "She replied that her husband had tried to kill her, that he tied her into a chair, that he poured gasoline on her and had set her on fire and then tried to burn the house down."

Emergency Room Nurse Patricia Halevy testified that Vickie was asked what had happened, and that she replied, "My husband tied me to a kitchen chair, poured gasoline from a boat all over me, and lit a match and, the pain, the pain." Halevy explained that Vickie was not in pain when she made this statement, and that her reference to "the pain" was to the agony she suffered during the fire. Additionally, Halevy testified that Vickie was alert and lucid at all times while being treated in the emergency room.

Palatine Police Officer Dale Ott testified that he interviewed Vickie at Evanston Hospital at about 8 p.m. the day of the fire. She had tubes in her nostrils and she signaled, by shaking her head, that she could understand his questions, but that she could not talk. During this interview, Vickie signaled "yes" when Ott asked if defendant had tried to kill her; if he had tied her up; and if he had poured gasoline on her. She indicated "no" when asked if defendant had poured gasoline all over her body, but answered "yes" when asked if defendant had just poured the gasoline over the lower portion of her body.

Officer Ott concluded the interview by asking Vickie why defendant did these things to her. On direct examination the police officer stated that "she responded by visualizing I don't know." He clarified this on cross-examination by explaining that (despite the tubes in her nostrils) Vickie answered the last question by speaking the words "I don't know."

Palatine Fire Captain William DePue testified that he questioned defendant at the scene of the fire, and asked what had happened in the house. In response, defendant "said he was carrying a can of gasoline through the house and his wife lit a cigarette and the gas ignited."

A neighbor, Terry Dineen, testified that he also questioned defendant at the scene of the fire, and defendant claimed, "I was fixing a motor, I love her, it wasn't suppose [sic] to end this way, I love her, we were folling [sic] around and I love her."

Captain DePue also testified that he questioned defendant a second time about the cause of the fire:

"He said it was just a game and I responded back questioning it's just a game. And he said he had gotten the gas can and brought it into the house and said something to her like this is

it. And then he said he lit a match and the gas ignited."

Cindy Jerard, a friend of both Vickie and defendant, testified that she wrote defendant asking what had happened, and defendant responded with a letter from jail in which he stated:

"I would like to tell you what really happened that day, but first you would have to promise me you wouldn't tell anybody. It would be incriminating if the wrong people heard about it. That's no line of B.S. either."

Testifying on his own behalf, defendant admitted that he drank beer all morning long on July 17, 1976, and that he took some L.S.D. around noon. Vickie was drinking that morning, and defendant claimed that she also took some L.S.D.

Vickie's parents were away on vacation, and he and Vickie went to her parents' house. He drank more beer and watched static lines on a television set. According to defendant, watching static lines on a television set is "a real trip when you're taking L.S.D."

Defendant gave the following explanation of the cause of the fire that killed his wife:

Vickie asked him to move things from the yard because her family had been having trouble with neighborhood children. Among the things he brought into the house was a can of gasoline from the family motor boat. He placed this can in the kitchen, took another beer from the refrigerator, and went back to watching television static.

Vickie approached him with an electrical cord and asked him to tie her up and make love to her. This was not unusual for them, and defendant complied by binding her legs, tying her hands behind her back, and (using the same piece of cord) tying a noose around her neck. Vickie also asked him to get some rubbing alcohol because she enjoyed the astringent feeling it produced when rubbed on her skin.

When he could not find any rubbing alcohol, he suggested that they try gasoline instead. She agreed, and defendant poured gasoline on a rag. Some of the gasoline spilled on the floor and, at Vickie's suggestion, defendant placed her in the puddle of gasoline on the floor and rubbed the gasoline soaked rag on her leg.

Then, while Vickie was hogtied and soaked in gasoline, defendant decided to smoke a cigarette. As soon as he struck a match, Vickie said, "What the hell are you doing?" Defendant said, "Oh, shit," blew the match out, and threw it toward another room. Suddenly, the house and Vickie were on fire. He tried to extinguish the flames, unsuccessfully, and left to get help.

Nineteen and one-half hours after the fire, Vickie died as a result of her burns.

Based on this evidence, the jury was convinced, beyond a reasonable doubt, that defendant was guilty of murder and arson. This appeal followed. Additional evidence is discussed below where pertinent.

OPINION

Defendant's first argument is that he was denied equal protection of the laws under the Federal Constitution (U.S. Const., amend. XIV, sec. 1), and was deprived of life, liberty or property without due process of law under the Illinois Constitution (Ill. Const. 1970, art. I, sec. 2), because the trial court denied his motion for discharge under the speedy-trial statute. (Ill. Rev. Stat. 1979, ch. 38, par. 103—5.) Explanation of the constitutional issues raised by defendant requires an understanding of the Illinois speedy-trial laws.

■ Defendants in criminal cases have a constitutional right to a speedy trial (Ill. Const. 1970, art. I, sec. 8), but this constitutional right "cannot be defined in terms of an absolute or precise standard of time, within which an accused must be given trial." (*People v. Henry* (1970), 47 Ill. 2d 312, 316.) Thus, the speedy-trial statute (now codified at Ill. Rev. Stat. 1979, ch. 38, par. 103—5) was enacted to give some concrete meaning to the right to speedy trial. *People v. Meisenhelter* (1942), 381 Ill. 378, 385.

The portion of the speedy-trial statute which is pertinent to the present case (a case in which the defendant remained in custody pending trial) provides that:

"Every person in custody in this State for an alleged offense shall be tried by the court having jurisdiction within 120 days from the date he was taken into custody unless delay is occasioned by the defendant [or certain other exceptions, immaterial to this case, are applicable]." Ill. Rev. Stat. 1979, ch. 38, par. 103—5(a).

■ If a defendant is not brought to trial within the specified period of time, and the matter is properly raised before the trial court, the statute provides that the defendant "shall be discharged from custody or released from the obligations of his bail or recognizance." (Ill. Rev. Stat. 1979, ch. 38, par. 103—5(d).) The trial court is specifically authorized to dismiss the charges if the speedy-trial provision is violated. (Ill. Rev. Stat. 1979, ch. 38, par. 114—1(a)(1); *People v. Reimolds* (1982), 92 Ill. 2d 101, 104.) And if a defendant is entitled to be discharged under the speedy-trial act, the prosecution cannot evade the mandate of this provision by dropping the initial charge and thereafter filing a new charge based on the same offense. *People ex rel. Nagel v. Heider* (1907), 225 Ill. 347, 350; *Newlin v. People* (1906),

221 Ill. 166, 175.

Therefore,

> "The operation of the statute typically will prevent the constitutional question of a speedy trial from arising, since if an accused is tried within 120 days after being taken into custody, or demand of trial while on bond, there will have been ordinarily no arbitrary or oppressive delay which the constitution prohibits." *People v. Love* (1968), 39 Ill. 2d 436, 441.

The issue which underlies the constitutional arguments raised in the present case concerns the manner in which the 120-day limitation period is calculated. Before section 103—5 was amended by Public Act 79—842, the rule was that for each delay in commencing trial which was "occasioned by the defendant" (Ill. Rev. Stat. 1975, ch. 38, par. 103—5(a)), the clock went back to zero on the 120-day speedy trial period. (*People v. Lee* (1969), 44 Ill. 2d 161, 166.) This took much of the "concreteness" out of the speedy-trial statute, however, and as amended by Public Act 79—842 (adding subsection (f)), and Public Act 79—1237 (changing the cutoff date specified in the new subsection), the speedy-trial act now provides that when a "delay is occasioned" by a defendant who is accused of having committed an offense on or after March 1, 1977, the clock merely stops running for the period of the delay. Ill. Rev. Stat. 1979, ch. 38, par. 103—5(f); *People v. Donalson* (1976), 64 Ill. 2d 536, 540.

In the present case, defendant contends that he was entitled to the benefit of the "new rule" established by Public Acts 79—842 and 79—1237 even though this provision expressly provides that it is not applicable to persons who, like the defendant here, are accused of having committed crimes which allegedly occurred before March 1, 1977. See Ill. Rev. Stat. 1979, ch. 38, par. 103—5(f).

Defendant concedes that he was tried within 120 days from when jurisdiction revested in the circuit court (see *People v. Adams* (1967), 36 Ill. 2d 492, 496), as calculated under the "old rule," but he argues that (a) he was not tried within 120 days as calculated under the "new rule" and (b) it is unconstitutional to deprive him of the benefit of the new method of calculating the running of the speedy-trial period.

Initially, the prosecution contends that we need not reach the constitutional issue on the grounds that defendant was, in fact, brought to trial within 120 days under the new law. This argument boils down to the claim (raised for the first time on appeal) that the trial court erred when it ruled that the State should be held responsible for causing a delay on May 6, 1980. It is not disputed that if the trial court

abused its discretion when it attributed this delay to the prosecution, then defendant actually was brought to trial within 120 days under both the old and new rules.

On review, "The decision of the trial court as to accountability for delay in bringing defendant to trial should be sustained, absent clear showing of abuse of discretion." *People v. Wilkins* (1979), 77 Ill. App. 3d 179, 182.

■ We find that it was not an abuse of discretion to attribute the May 6 delay to the prosecution because (1) the prosecutors who tried this case expressly asked the trial court for a continuance on May 6, 1980; (2) they never asked the trial court to attribute this delay to the defense; and (3) they never objected to the trial court's ruling that the delay should be attributed to the State. We hold that under these circumstances, the trial court did not abuse its discretion.

Defendant argues that the failure to give him the benefit of the new method of calculating the running of the speedy-trial period deprived him of equal protection of the laws. (U.S. Const., amend. XIV, sec. 1.) He agrees that the appropriate equal protection test to be used in determining the validity of the classification created by the March 1, 1977, cutoff date is the traditional rationality standard. Under this test, the key question "is whether the challenged state action rationally furthers a legitimate state purpose or interest." (*San Antonio Independent School District v. Rodriguez* (1973), 411 U.S. 1, 55, 36 L. Ed. 2d 16, 56, 93 S. Ct. 1278, 1308.) To be valid under the equal protection clause, the classification created by the statute must be rationally related to a legitimate governmental objective. *McDonald v. Board of Election Commissioners* (1969), 394 U.S. 802, 809, 22 L. Ed. 2d 739, 745-46, 89 S. Ct. 1404, 1408.

Defendant contends that, as applied to him, the statutory classification created by the March 1, 1977, cutoff date is not rationally related to what he identifies as "the" purpose of picking that particular date as a boundary line. Based on his analysis of the legislative debates on the bill which became Public Act 79—1237, he asserts that "the" purpose of establishing the March 1, 1977, cutoff date was to enable the criminal justice system to gear up for the big crunch of cases that was expected when the new method of calculating the speedy-trial term became effective.

Focusing exclusively on what he identifies as "the" purpose of establishing March 1, 1977, as a cutoff date, defendant argues that by 1979, when his case was remanded to the circuit court for retrial, the criminal justice system had more than enough time to prepare for application of the new speedy-trial rule. Thus he concludes that in this

case the statutory classification is not rationally related to "the" purpose of picking March 1, 1977, as a cutoff date.

Defendant implicitly recognizes that what he identifies as "the" purpose of the challenged classification was, at most, merely the primary purpose of the legislature. In his reply brief, defendant acknowledges that a subordinate legislative purpose was the need for drawing a bright line between application of the old and new rules, and he states that he "has no quarrel with the purpose of the effective date of the 'new' rule, nor does he quarrel with the date itself." Nevertheless, defendant continues to insist that the validity of the classification must be determined based on what he identifies as the primary objective of the legislature.

The decisions of the United States Supreme Court, however, "do not authorize courts to pick and choose among legitimate legislative aims to determine which is primary and which is subordinate." (*McGinnis v. Royster* (1973), 410 U.S. 263, 276, 35 L. Ed. 2d 282, 292, 93 S. Ct. 1055, 1062.) As the court explained in *McGinnis*:

> "So long as the state purpose upholding a statutory class is legitimate and nonillusory, its lack of primacy is not disqualifying.
>
> When classifications do not call for strict judicial scrutiny, this is the only approach consistent with proper judicial regard for the judgments of the Legislative Branch. The search for legislative purpose is often elusive enough, *Palmer v. Thompson*, 403 U.S. 217 (1971), without a requirement that primacy be ascertained. Legislation is frequently multipurposed: the removal of even a 'subordinate' purpose may shift altogether the consensus of legislative judgment supporting the statute. Permitting nullification of statutory classifications based rationally on a nonprimary legislative purpose would allow courts to peruse legislative proceedings for subtle emphases supporting subjective impressions and preferences. The Equal Protection Clause does not countenance such speculative probing into the purposes of a coordinate branch." 410 U.S. 263, 276-77, 35 L. Ed. 2d 282, 292, 93 S. Ct. 1055, 1063.

■■ The supposedly "subordinate" legislative purpose in the present case is the need for providing a bright line which will clearly identify which method of calculating the speedy-trial term should be used in a particular case. No matter how strong proof of guilt might be, failure to comply with the speedy-trial requirements of section 103—5 will result in the discharge of even the worst mass murderer. The State clearly has a legitimate and nonillusory interest in acting to

prevent guilty defendants from being discharged as the result of inadvertent use of the wrong speedy-trial rule. And we find that it was rational for the legislature to conclude that this legitimate governmental interest would be substantially furthered by specifying March 1, 1977, as a bright-line boundary between application of the old and new speedy-trial rules.

Ironically, the basis for the equal protection attack in the present case is (as it was in *McDonald v. Board of Election Commissioners* (1969), 394 U.S. 802, 22 L. Ed. 2d 739, 89 S. Ct. 1404, and *Schilb v. Kuebel* (1971), 404 U.S. 357, 30 L. Ed. 2d 502, 92 S. Ct. 479) the argument that the statutory reform implemented by the Illinois General Assembly should be held invalid because it doesn't go "far enough" in eliminating a particular evil or mischief. But, as the Supreme Court explained in *McDonald*, "That Illinois has not gone still further, as perhaps it might, should not render void its remedial legislation, which need not, as we have stated before, 'strike at all evils at the same time.' " 394 U.S. 802, 811, 22 L. Ed. 2d 739, 748, 89 S. Ct. 1404, 1412; *cf. Williams v. Walsh* (1912), 222 U.S. 415, 421, 56 L. Ed. 253, 255, 32 S. Ct. 137, 138 (holding that the equal protection clause "does not forbid statutes and statutory changes to have a beginning, and thus discriminate between the rights of an earlier and later time").

The remaining constitutional issue raised by defendant is that failure to give him the benefit of the new method of calculating the speedy-trial term deprived him of life, liberty or property without due process of law under section 2 of article I of the 1970 Illinois Constitution.

The threshold question in a due process analysis is whether a litigant has been deprived of life, liberty or property by operation of the challenged law or governmental action. This is where defendant's due process attack fails.

Defendant was initially deprived of his liberty because there was a judicial determination, after a preliminary hearing, that there was probable cause to believe he had murdered his wife. And defendant is now being deprived of his liberty because a jury was convinced, beyond a reasonable doubt, that he is guilty of murder and arson. Therefore, defendant has not been deprived of liberty by operation of the speedy-trial laws. Furthermore, the provisions of Public Acts 79—842 and 79—1237 clearly specify that the legislature's reform would not be applicable to defendant's case. Consequently defendant did not have a legitimate or justifiable claim of entitlement (*i.e.*, a property interest) in obtaining benefit of the new speedy-trial rule.

██ Defendant has not been deprived of life, liberty or property by operation of Public Acts 79—842 and 79—1237, and we conclude that he has not been deprived, as a result of these amendatory laws, of any interest protected by the due process clause.

Defendant next argues that the trial court erred when it admitted into evidence testimony about hearsay statements allegedly made by his wife concerning the cause of the fire which eventually killed her. Specifically, defendant contends that the evidence was not sufficient for the trial court to conclude, beyond a reasonable doubt, that (a) the statements were made in contemplation of imminent death; and (b) that the declarant was competent when the declarations were made. We disagree.

By definition, the dying declaration exception to the rule against admitting hearsay evidence concerns a situation in which the defendant is unable to confront his accuser "face to face." Furthermore, the defendant

"is deprived of the security of an oath attended with consequences of temporal punishment for perjury. He is deprived of the great safeguard against misrepresentation and misapprehension—the power of cross-examination. The evidence is hearsay in its character; the statements are liable to be misunderstood and to be misrepeated upon the trial, and the evidence goes to the jury with surroundings tending to produce upon the mind emotions of deep sympathy for the deceased, and of involuntary resentment against the accused." *Starkey v. People* (1855), 17 Ill. 17, 20.

But, despite serious reservations about "the infirmities and imperfections of the human mind, and its susceptibility to false impressions, under circumstances touching the heart and exciting the sympathies" (17 Ill. 17, 20-21) courts have held that hearsay statements relating to the cause of the injuries from which a declarant subsequently died are admissible as substantive evidence if they were made while the declarant believed that death was imminent and certain. (See 17 Ill. 17, 21.) It is thought that if such declarations are made in contemplation of imminent and certain death, they will be as reliable as statements made under oath in court. *Collins v. People* (1902), 194 Ill. 506, 519; *Mattox v. United States* (1892), 146 U.S. 140, 152, 36 L. Ed. 917, 922, 13 S. Ct. 50, 54; 5 Wigmore, Evidence sec. 1438, at 289 (Chadbourne rev. ed. 1974).

"The principle upon which such declarations are admitted is that they are made in a condition so solemn and awful as to exclude the supposition that the party making them could have

been influenced by malice, revenge or any conceivable motive to misrepresent, and when every inducement, emotion and motive is to speak the truth." *Starkey v. People* (1855), 17 Ill. 17, 21.

Various formulations have been used to express the appropriate state of mind (*e.g., Barnett v. People* (1870), 54 Ill. 325, 329 ("belief that his dissolution is near at hand, and without hope of recovery"); *People v. Borella* (1924), 312 Ill. 34, 44 ("whether or not the declarant has abandoned hope of living and looked on death as certainly impending"); *People v. Hubbs* (1948), 401 Ill. 613, 621 ("under the firm belief and conviction that death was imminent and near at hand"); *Shepard v. United States* (1933), 290 U.S. 96, 99, 78 L. Ed. 196, 199, 54 S. Ct. 22, 23 ("spoken without hope of recovery and in the shadow of impending death"), but the essential inquiry is whether the declarant is so convinced of the likelihood of impending death that motives for falsification will be obviated. Thus it has been held that,

"It is not necessary that the deceased actually be at the point of death or that the statement be made at the time deceased is breathing his last." *People v. Corder* (1922), 306 Ill. 264, 275.

An additional requirement of the dying declaration exception—a requirement which follows from the general rule that witnesses must be competent—is that "The declarant must be in possession of his mental faculties sufficiently to understand what he is doing and to be able to give a true and correct account of the facts to which the statement relates." *People v. Tilley* (1950), 406 Ill. 398, 403.

■ Similarly, in light of the dangers referred to in *Starkey*, the Illinois rule is that before hearsay can be admitted in a jury trial as a dying declaration, the trial court must hold a preliminary hearing outside the presence of the jury, and must be convinced beyond a reasonable doubt that the requirements of the exception have been proven by the profferor. *People v. Tilley* (1950), 406 Ill. 398, 403-04.

■ The declarant's belief that death was certain and impending "may be made to appear from what the injured person said; or from the nature and extent of the wounds inflicted, being obviously such that he must have felt or known that he could not survive." (*Mattox v. United States* (1892), 146 U.S. 140, 151, 36 L. Ed. 917, 921, 13 S. Ct. 50, 54.) This principle is illustrated by *State v. Brown* (1967), 271 N.C. 250, 261, 156 S.E.2d 272, 280, where the declarant died 25 hours after suffering severe burns over 70% of her body. The North Carolina Supreme Court held that because the declarant suffered such severe injuries, she must have known death was imminent and certain. Therefore, it was proper to admit evidence of her statements

that the defendant had poured gasoline on her and set her on fire. See also *United States v. Barnes* (D.C. Cir. 1972), 464 F.2d 828 (hearsay statements held admissible where (1) the declarant suffered second and third degree burns over 80% of her body; (2) she said she was going to die, and (3) she died the next day).

The decedent in the present case (1) suffered second and third degree burns over 60% of her body, plus first degree burns over 20% of her body; (2) she said she thought she was going to die from her injuries; and (3) she died 19½ hours after the fire, as a result of her burns. Furthermore, all the medical personnel who were called at trial testified that she was able to answer all their questions, and that she was alert and lucid at all times.

Nothing contradicts this proof of Vickie's competence except defendant's assertion that Vickie took L.S.D. the day of the fire, and his speculation that, at some unspecified dosage, the drugs she received as part of her emergency treatment could cause psychic derangement.

 █ In Illinois, a reviewing court will not substitute its own judgment for the trier of fact's findings unless those findings are "palpably contrary to the manifest weight of the evidence." (*People v. Nicholls* (1969), 42 Ill. 2d 91, 95.) We are convinced that it was not palpably against the manifest weight of the evidence for the trial court to find that (1) Vickie's hearsay statements concerning the circumstances of her injuries were made in contemplation of imminent and certain death, and (2) she was competent when the statements were made.

Defendant further argues that the trial court erred when it denied his motion to preclude Vickie's mother from testifying as a rebuttal witness. The basis for this motion *in limine* was the contention that Vickie's mother could not provide any proper rebuttal testimony.

The trial court observed that motions *in limine* can be abused, and the court denied defendant's motion on the grounds that the relevance of the proffered rebuttal testimony could not be determined before the court heard the prosecutor's questions. In denying the motion to exclude, however, the court expressly contemplated that the defense attorneys would object if the prosecutor asked improper questions, or if improper responses were made.

 Nevertheless, the defense did not object, during the examination of the witness or at any time before verdict, to the testimony which defendant now claims was improper. This constituted a waiver of the right to assert that this was error.

"[A] party who fails to object to claimed error committed during

trial waives the right to urge the claim on appeal." (*People v. Dukett* (1974), 56 Ill. 2d 432, 442.) "The failure to present proper and timely objection generally constitutes a waiver of error, if any." (*People v. Adams* (1968), 41 Ill. 2d 98, 101.) This waiver rule is applicable whenever there was no objection prior to verdict and the purported error could have been corrected or cured during the trial. *People v. McCurrie* (1929), 337 Ill. 290, 296.

> "The failure of counsel to object at trial waives those errors which the court can correct by sustaining an objection and admonishing the jury. Otherwise, counsel, by not giving the court the opportunity to prevent or correct error at trial, will gain the advantage of obtaining a reversal through his own failure to act, either intentionally or inadvertently." *People v. Carlson* (1980), 79 Ill. 2d 564, 577.

Defendant contends on appeal that the trial court erroneously admitted irrelevant rebuttal testimony. However, the record shows that there were no objections made when the purportedly improper testimony was given, even though the alleged errors could have been corrected or cured upon timely objections. "The failure of defendant to object to [purportedly improper rebuttal testimony] clearly precludes him from alleging an abuse of discretion before this court." *People v. Miller* (1964), 30 Ill. 2d 110, 114.

We recognize that Supreme Court Rule 615(a) authorizes us to consider purported errors "although they were not brought to the attention of the trial court." (73 Ill. 2d R. 615(a).) But Rule 615(a) is "a limited exception to the waiver doctrine" (*People v. Carlson* (1980), 79 Ill. 2d 564, 577-78), which is invoked "as a matter of grace" (*People v. Burson* (1957), 11 Ill. 2d 360, 370), not as a matter of right.

The waiver principle may occasionally lead to harsh results, but we do not find that the present case calls for the invocation of our power to grant indulgences from the effects of the waiver rule.

Another defense argument is that closing prosecution arguments were improper and unfairly prejudicial. The only example cited in defendant's motion for a new trial to support this conclusion, however, concerns a misstatement made by a prosecutor about defendant's efforts to rescue his wife from the burning house. The significance of this contention requires some explanation.

The evidence of Vickie's dying declarations was that she said she had been tied "to" or "into" a chair. And, even though she was not tied to a chair when she was rescued from the burning house by a neighbor, there was evidence that a pair of pantyhose was tied to her hair. Also, there was evidence that defendant ran back into the burn-

ing building and remained inside alone with Vickie for an unspecified period of time. So the prosecution theory was that defendant had tied her to a chair with the pantyhose, and that he untied her when he ran back into the house.

During closing argument, a prosecutor misstated the evidence by declaring that defendant had spent "a minute" with Vickie when he ran back into the burning house.

The defense promptly objected to this misstatement, and this timely objection was sustained.

Another instance of improper closing argument by a prosecutor was brought to the trial court's attention during the hearing on the motion for a new trial. This other comment concerned an attempt to explain the difference between "intent" and "knowledge." The prosecutor told the jury that intent to kill could be inferred circumstantially, such as when someone aims and fires a gun at a person against whom they have a grudge. Then the prosecutor went on to say that someone would be considered as having acted with "knowledge" if he aimed a gun at a ceiling, pulled the trigger, and some unintended victim died when the bullet ricocheted.

The defense promptly objected to this misstatement of law (see Ill. Rev. Stat. 1979, ch. 38, par. 4—5(b)), and the trial court both sustained the objection and admonished the prosecutor.

The appropriate question in reviewing the effect of improper prosecutorial closing argument is whether the trial court erred in concluding that it had effectively eliminated the prejudicial impact of the improper statements.

> "[A]lthough the prejudicial effect of an improper argument cannot always be erased from the minds of the jurors by an admonishment from the court (*People v. Garreau* (1963), 27 Ill. 2d 388, 391), the act of promptly sustaining the objection and instructing the jury to disregard such argument has usually been viewed as sufficient to cure any prejudice." *People v. Baptist* (1979), 76 Ill. 2d 19, 30.

 █ Prosecutorial argument is improper and unfairly prejudicial if there is a reasonable likelihood that it will induce the jurors to reach a verdict based on factors other than the law and the properly admitted evidence. In the present case, however, the court promptly sustained objections to the improper comments, and in one instance, *sua sponte* admonished the prosecutor, even though the defense did not ask that the jury be instructed to disregard either one of the comments in question. We find that these improper statements, as cured by the trial court, were not so inflammatory as to cause a reasonable

likelihood of unfair prejudice to defendant. We therefore conclude that the trial court did not err in deciding that its remedial actions removed the taint of the improper comments.

Various other instances of allegedly improper closing argument are raised on appeal although these particular points were not referred to in defendant's motion for a new trial. However, points not raised in defendant's motion for a new trial are waived and generally will not be considered on appeal. *People v. Pickett* (1973), 54 Ill. 2d 280, 282; *People v. Armes* (1963), 28 Ill. 2d 83, 87; *People v. Zielinski* (1957), 10 Ill. 2d 473, 478.

> "The purpose of this rule is apparent. Requiring defendant's written motion for a new trial to specify the errors allegedly entitling him to a new trial may save the delay and expense inherent in an appeal in those instances where the motion is meritorious. Additionally, it focuses the attention of the trial judge upon those aspects of the proceedings of which the defendant complains, and gives to the reviewing court the benefit of the judgment and observations of the trial court with reference thereto. In short, we believe this waiver rule a salutary one serving a legitimate State interest in that it tends to eliminate unnecessary reviews and reversals." *People v. Irwin* (1965), 32 Ill. 2d 441, 443-44.

The remaining instances of allegedly improper closing argument asserted on appeal were waived because they were not adequately brought to the trial court's attention in the motion for a new trial. Moreover, the points which were waived generally concern the typical disagreements over the evidence which invariably occur during closing arguments, and we do not find that this case calls for the exercise of our power, under Supreme Court Rule 615(a), to consider issues which have been waived.

The remaining issue is whether the evidence was sufficient to convince the jury beyond a reasonable doubt that defendant is guilty of murder and arson.

The prosecution is required to prove guilt in criminal cases beyond a reasonable doubt. (Ill. Rev. Stat. 1979, ch. 38, par. 3—1.) But, "We recognize that the conduct and demeanor of a witness on the stand and his action under cross-examination have a strong bearing upon the weight to be accorded his testimony." (*People v. Stoneking* (1919), 289 Ill. 308, 312.) So, in deciding whether evidence is sufficient to support a conviction, reviewing courts are acutely aware that it is usually impossible to evaluate the veracity of witnesses without having had an opportunity to observe and hear the actual testimony.

As a result of the difficulty of evaluating testimonial credibility when review is based upon nothing more than the reading of a lifeless transcript, appellate courts are deferential in their review of a jury's findings of fact. (See *People v. Bond* (1917), 281 Ill. 490, 499.) The jury's fact findings, therefore, will not be set aside merely because the prosecution and defense witnesses contradict each other. *People v. Friedman* (1940), 374 Ill. 212, 219; *People v. Bond* (1917), 281 Ill. 490, 499.

 The Illinois rule is that a reviewing court "will not disturb the finding of the jury unless it can be said that there is not sufficient credible evidence to establish the guilt of an accused beyond a reasonable doubt, or unless the evidence is deemed so improbable or unsatisfactory as not to be worthy of belief." (*People v. Long* (1950), 407 Ill. 210, 212.) "The verdict of the jury on questions of fact will not be disturbed unless palpably contrary to the weight of the evidence." *People v. Kelley* (1928), 330 Ill. 562, 563; accord, *People v. Kandian* (1935), 360 Ill. 217, 225; *People v. Glasser* (1929), 335 Ill. 263, 269; *People v. Anderson* (1934), 355 Ill. 289, 306.

The evidence in the present case shows that, while defendant was stoned on L.S.D., he tied up his wife, soaked her with gasoline, and started the fire that killed her. In dying declarations—statements which were admissible as substantive evidence—Vickie Rhoads stated that defendant tried to kill her by setting her on fire.

This incriminating evidence was contradicted by defendant's claim that the fire was just an accident, an accident caused when he absentmindedly decided to smoke a cigarette while standing next to someone he had just hogtied and soaked with gasoline.

Not only was defendant's story improbable, but his testimonial credibility was impeached with evidence that he made inconsistent statements at the scene of the fire, including his claim that the fire started when Vickie, whose hands were tied behind her back, lit a cigarette. Defendant also incriminated himself by writing a letter in which he acknowledged that "it would be incriminating" if he revealed the truth about the fire. And, still further, according to Captain DePue, defendant admitted that before lighting the match that started the fatal fire, he told Vickie "this is it."

Although one witness testified that Vickie said "it was an accident" soon after being rescued from the burning building, it was not manifestly erroneous for the jury to find that this witness was mistaken.

 Accepting as true the jury's findings on the credibility of the witnesses (see *People v. Long* (1950), 407 Ill. 210, 212), we find that

there is sufficient credible evidence to prove defendant guilty beyond a reasonable doubt. The verdict finding defendant guilty of murder and arson is not palpably contrary to the weight of the evidence, and we would not be justified in reversing the jury's findings of fact.

Based on all of the preceding reasons, the judgment of the circuit court is affirmed.

Affirmed.

SULLIVAN, P.J., and MEJDA, J., concur.