THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* MICHAEL HOBSON, Defendant-Appellant.

Fourth District No. 4—82—0691

Opinion filed August 4, 1983.

Daniel D. Yuhas and Jeffrey D. Foust, both of State Appellate Defender's Office, of Springfield, for appellant.

Ronald C. Dozier, State's Attorney, of Bloomington (Robert J. Biderman and Howard Hood, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

PRESIDING JUSTICE WEBBER delivered the opinion of the court:

Defendant was indicted by a grand jury in McLean county for the murders of Mary and Russell Roughton, two children of the ages of nine and seven years respectively, in violation of section 9—1 of the Criminal Code of 1961 (Ill. Rev. Stat. 1981, ch. 38, par. 9—1); the multicount indictment also charged him with the aggravated kidnaping of the children in violation of section 10—2 of the Code (Ill. Rev.

Stat. 1981, ch. 38, par. 10—2); and with three counts of theft of property exceeding $300 in value in violation of section 16—1 of the Code (Ill. Rev. Stat. 1981, ch. 38, par. 16—1). The latter counts alleged theft of a Datsun pickup truck, a Chevrolet pickup truck, and a red Chevrolet motor vehicle. The count concerning the red Chevrolet was severed and the record reveals no disposition of it. Defendant was tried to a jury in the circuit court of McLean county and was found guilty of all the offenses which were submitted to the jury. The State sought the death penalty for the murders, but the jury was unable to find unanimously beyond a reasonable doubt that it should be imposed. The trial court then sentenced the defendant to a term of natural life pursuant to section 5—8—1(a)(1)(c) of the Unified Code of Corrections (Ill. Rev. Stat. 1981, ch. 38, par. 1005—8—1(a)(1)(c)) for the murders of Mary and Russell Roughton; extended term sentences of 30 years each of imprisonment were imposed on the aggravated kidnaping convictions; and five years of imprisonment on each of two theft convictions, specifically, the Datsun pickup truck and the Chevrolet pickup truck.

On appeal defendant raises four principal issues which may be broadly described as: (1) error by the trial court in denying his pretrial motion to quash his arrest and suppress evidence; (2) reasonable doubt as to murder and aggravated kidnaping of the children; (3) whether defendant received a fair trial by a jury which was "death qualified;" and (4) the constitutionality of section 5—8—1(a)(1)(c) requiring a life sentence in the case of multiple murders.

The evidence against the defendant, except for the theft of the trucks, was largely circumstantial, and, as so frequently happens in such cases, the record consists of fragments of testimony and exhibits. In an effort to give a coherent narrative, we have rearranged the sequence of the testimony.

Ramona Hauptman, who was also known as Mickey Coyle, was the mother of the victims, Mary and Russell Roughton. The defendant was described as her "step cousin" and had lived with her and the children in the village of McLean from the month of February 1982 through a part of April 1982.

On Wednesday, April 21, 1982, Russell and Mary ate breakfast and were sent by Ramona at about 8:10 a.m. to the post office to pick up the mail. It was an approximate five-minute walk. The children were to return the mail home before going on to school. They did not return from the post office and the police were notified.

On the following day, Thursday, April 22, at about 2:40 p.m., their bodies were discovered in a gravel pit and dumping area which was

located about 1½ to 2 miles north of McLean. Nearby was a partially burned blue Chevrolet pickup truck and near the truck were found four pieces of mail and a box of books from a book club, all addressed either to Mickey Coyle or Ramona Coyle. One of the pieces contained a money order receipt from the Bank of Hallandale, Hallandale, Florida, for $25. The remitter was William Boemecke, who testified that he was Ramona's boyfriend and had sent her six separate $25 money orders in an envelope on April 19, 1982.

Medical testimony indicated that death had occurred between 9 a.m. and 12 noon on Wednesday, April 21. Mary had received three blows to her head with a pointed object, two of which penetrated the head and either could have caused death. The wounds had a V-shaped configuration. Russell had received two blows with a blunt object to the head. Neither penetrated but they made a large depression fracture of the skull sufficient to cause death. Another less lethal wound was found on his head and had the same V-shaped appearance as the blows to Mary's head. A pry bar was recovered from the cab of the burned pickup truck. The truck's owner testified that it had been kept in the glove box. The pathologist testified that it could have caused the injuries. After examining the scene, he was of the opinion that it was unlikely that the blows had been inflicted there. Two sheets of plastic material, called "visqueen," were found near the truck; they had apparently been used to roll the bodies of the children down the mound upon which the truck was found.

Following the discovery and removal of the bodies during the afternoon of April 22, the police posted a watch over the area. The geography is not entirely clear from the record, but it appears that a road, known as the McLean/Funks Grove blacktop, runs north out of McLean towards Bloomington. About 1½ to two miles north of the village it is intersected by a gravel road which runs east to the dumping area. Three sheriff's reserve officers were dispatched to this road to keep the curious out. They were in two vehicles, a regular sheriff's squad car and an unmarked car; two reserve officers, Harbison and Cosentino were in the squad car; the third, Arendt, was in the unmarked car. Both cars were pulled into the gravel road, side by side, headed east. They relieved another officer who was there about 7 p.m.

Harbison testified that some traffic passed by on the blacktop during the course of the evening. At about 11:30 p.m. a small truck with a camper top passed by northbound. Harbison's attention was drawn to it because of its slow speed, approximately 10 miles per hour, according to his estimate. About 15 minutes later the same vehicle re-

turned, this time headed south, and again at the slow rate of speed. Harbison testified that he instructed Arendt to follow the vehicle if it came by a third time and obtain its license number.

At about 11:55 p.m. Harbison and the other reserve officers were relieved at the scene by two deputy sheriffs, Springer and Fillmore. Harbison informed them of the actions of the camper. Springer testified that about 12:25 a.m., it now being April 23, he observed a dark-colored Datsun pickup truck with a light-colored "topper" southbound on the blacktop. It slowed almost to a stop at the gravel road leading to the dump and then proceeded down the blacktop about one-quarter of a mile, at which point its brake lights came on, and it again slowed. Springer testified, "Officer Fillmore radioed to the officer that was working in McLean. It was the McLean marshal and Sgt. Kistner of our department. And he radioed what we observed happened."

The McLean marshal was Steven Craig, who testified that he and Kistner, upon receiving Fillmore's radio dispatch, proceeded to the north part of the village and took up positions at a gravel road located there. In due course the pickup truck with the topper came past and Craig pulled onto the blacktop behind it and activated his emergency lights. Several blocks into the village the truck stopped with Craig's squad car behind it. Craig testified that it was his intention to give the driver a verbal warning for failure to dim headlights.

Craig went to the driver's side of the truck to speak to the driver and Kistner took a position on the passenger side. Craig asked for a driver's license; it was produced; and the driver was Hobson, the defendant. Craig told him to step out of the vehicle and then conducted a security pat-down which produced a glass pipe from the left jacket pocket. Craig handed the pipe to Kistner, who had come around to the driver's side.

Meanwhile, Harbison, after being relieved at the scene, had returned to McLean and arrived at the place where the truck had been stopped by Craig. He testified that it appeared to be the same truck which he had observed twice earlier at the dump scene.

Kistner had attended a staff meeting earlier where he had been instructed that if he saw Hobson, he was to ask him to come in to headquarters at Bloomington to speak with detectives. He did so ask the defendant, who indicated that he was willing to go. Kistner then further explained to defendant that it would be necessary to handcuff him for the trip to Bloomington. This was departmental policy since the vehicle did not have a security shield. The defendant then turned about and offered his hands behind his back to Kistner, who placed the handcuffs on him. He was then placed in the back seat of

Kistner's vehicle.

Kistner's testimony was that the radio dispatch from Fillmore regarding the pickup truck had arrived at 12:25 a.m. and that the defendant was in the back of his vehicle after being handcuffed at about 12:30 a.m., or about five minutes later. At this time another radio dispatch was received from headquarters that the pickup truck was a stolen one. Kistner also testified that the defendant was at all times cooperative and that he did not ever advise the defendant that he was, or was not, under arrest.

The trip to Bloomington was accomplished without incident and without conversation. Upon their arrival there, Kistner caused the defendant to be seated in the lobby of the building while he informed detectives of his presence.

Defendant was then interviewed at 12:50 a.m. by a special investigator from the Illinois Department of Corrections, Criminal Investigation Divison, Lindsey. Lindsey informed him that he was under arrest for driving a stolen vehicle and administered the *Miranda* warnings, which the defendant acknowledged and signed a waiver of rights. He admitted stealing the truck and stated that he was enroute to visit his cousin, Mickey Coyle, and became lost. He also gave an exculpatory statement of his whereabouts on April 21 and 22. In substance, he claimed to have spent the day of April 21 in Ottawa and did not leave there until on a 6:30 p.m. bus on April 22, which arrived in Bloomington at 8:30 p.m. He then walked around Bloomington until he took the truck.

The conversation then turned to the disappearance of the children. A detective from the McLean county sheriff's office, Tulle, spoke to the defendant, informing him that the police knew that he had stolen another truck in Pontiac. Tulle stated, "The keys were in the truck weren't they?" The defendant replied, "Yes." He then admitted to being in the vicinity of the children's home in that truck. However, he also claimed to have been on "speed" and "grass" during the preceding four days and had no real recollection of events.

At one point in the conversation, Tulle told the defendant that the police knew that he had been near the children's home and had seen them walking with the mail and "you just picked them up and didn't want to hurt them, just wanted to give them a ride. Right?" The defendant's response was a single nod of the head. He was then advised that the truck stolen in Pontiac had been found together with the bodies of the children. The interview then ended.

From this recitation it can be seen that the State had no direct evidence, save for the equivocal nod of the head during the interview,

of the defendant's involvement in either the kidnaping or the murder of the children. It was the State's theory that the defendant committed the offenses with the motive of robbery. To this end, it built a circumstantial case, which we now examine.

Ramona Hauptman, the children's mother, testified that the defendant had lived with her and the children from February 1982 through part of April 1982. On March 31, 1982, she gave him approximately $80 with which to obtain money orders from the post office; he was to bring these back to her for completion; this was done and she filled one out for $56 for payment on a television set and the other for $13 or $14 for a utility bill; she then returned the money orders to him and directed him to mail them to the creditors. On April 9 the television dealer informed her that her last two payments had not been received.

The postmaster of McLean testified that the defendant had purchased a money order for $56 on March 31 and a few days later came back and asked to cash it. It had been altered to make him the payee. The postmaster refused to do so for lack of identification, but later did cash the money order. He also testified that two children came to the post office on the morning of April 21 between 8:30 and 8:45 a.m. and that he gave them the mail from Box 123, which was that of Mickey Coyle.

Ramona Hauptman further testified that she had two conversations with the defendant concerning the $56 money order, one on April 12 and the other on April 13. She told him that the money order had been altered and the the police would be looking for him. He then took his clothing and left. She next saw him at an auction sale on April 16. He then attempted to sell her a coat for $10 in order to obtain gasoline to go to Wisconsin.

Further testimony from various witnesses concerned vehicles and the presence of the defendant from time to time and place to place in the days preceding April 21 and afterwards. It was established that on Sunday, April 18, defendant was in Ottawa in a red and white GMC flatbed truck. He mentioned that he was going to Pontiac.

A mechanic from a service station in Pontiac testified that at 5:30 a.m. on Tuesday, April 20, he observed a flatbed truck in the parking lot of the station. A blue pickup truck which had been parked there the night before was missing. The flatbed was parked next to the area where the blue pickup had been.

At 7 a.m. the same morning, April 20, a witness was in the Dixie Truck Stop near Bloomington having breakfast. When he left, he found that the magnetic signs had been removed from his truck. The

legend on the signs was: "Neal Ellis, Hoopeston, Illinois."

At 6 p.m. on that date, April 20, defendant was seen by a friend in Farmer City. He was sitting in a blue Chevrolet truck with white magnetic signs on the doors. Defendant and the friend went to a trailer where they obtained a five-gallon gasoline can; they then went to a service station where they took a funnel; and they then went to a John Deere dealership where they stole some gasoline from a tractor. Defendant was invited to spend the night with the friend, but he replied that he had to go to McLean "to wait on some lady to get some money in the mail."

At about 7:40 a.m. on Wednesday, April 21, the day upon which the children disappeared, a school bus driver saw a blue pickup truck attempting to park in McLean. Her attention was drawn to the plastic magnetic sign on it because the sign was askew. She observed the name "Neil" and the city of "Hoopeston" on the sign. Various other witnesses testified of the presence of the blue pickup in McLean that morning between 7:30 and 8 a.m. Descriptions of the driver varied, but he was typically described as a white male with brown or blond hair.

At 9:15 a.m. on April 21 a witness saw a huge amount of smoke emanating from the dump area. At 10:30 a.m. another witness picked up a hitchhiker on the Funks Grover blacktop; he asked to be taken to Bloomington, but the witness was going only as far as Funks Grove and let him out there. At about 4:30 to 5 p.m. the ticket seller in the Bloomington bus station, who knew the defendant, saw him in the bus station waiting for a 6:25 p.m. bus to Ottawa. She also observed him talking to a cab driver. The cab driver, who had previously on April 13 driven defendant to a house in McLean where he obtained a duffle bag and then returned him to Bloomington, testified that he saw the defendant in the bus station at 6 p.m. on April 21. The defendant indicated to him that he was going to Ottawa.

Another witness stated that he was at a party in Ottawa on the evening of April 21 at about 7:30 p.m. He and some others left the party to go bicycling and about an hour later stopped at one of their houses. Defendant was present there. Defendant and the others stayed together throughout the night hours and began playing basketball at about 5:30 a.m. on Thursday, April 22, and stopped playing about 6:30 to 7 a.m. The witness again saw the defendant in Ottawa at 9 a.m. and at 3:30 p.m. on April 22.

On April 22 at about 6 p.m. defendant purchased a bus ticket from an employee of a billiard parlor in Ottawa; the ticket was for Bloomington. The bus driver testified that the defendant got on the

bus at Ottawa and got off at Bloomington at about 8:30 p.m.

An Illinois State police officer testified that during the morning hours of April 22 he saw a man named Larry Wolford hitchhiking along Interstate 55 near Bloomington. He was very dirty and had long, light brown hair; he was glassy-eyed, and the officer decided to restrain him. This was done with the assistance of another officer, and Wolford was booked in the McLean County Law and Justice Center.

The State introduced forensic evidence concerning blood found on the lower right leg of defendant's trousers. The serologist compared it with blood and hair samples from defendant, Larry Wolford, Mary Roughton, and Russell Roughton. The blood was type B and Russell Roughton was the only one of the four with that type. The enzyme system tests were also consistent with Russell's blood standards.

This was the State's case. Defendant presented a number of witnesses. Three of them testified that they saw no smoke from the dump area on April 21 at 8: 40 a.m. or at 11:25 a.m., or from 3 p.m. to 6 p.m. A criminologist from the Department of Law Enforcement testified that one under the influence of cannabis would drive a car very slowly. A friend placed defendant in Farmer City during the evening of April 20 until the early morning hours of April 21. He also testified to the stealing of the gasoline on the evening of April 20. Defendant's sister testified that she spoke with Ramona Hauptman at 10:30 a.m. on April 21; at that time in answer to the question Hauptman stated that the children were "fine." Defendant's aunt testified that she had entrusted her own children to defendant and that in 1978 he had taken care of them every day for a week. A friend testified that he saw defendant in Ottawa on Sunday, April 18, and again on Wednesday, April 21, at approximately 7 p.m. when he did not appear to be out of the ordinary. Another friend testified that he saw the defendant in Ottawa on April 18 and again on April 21 at 3 p.m. On the latter date defendant was coming out of a billiard parlor, and he and defendant and another person, Lewis, remained together in Ottawa throughout the evening and night hours. Lewis' mother testified that she saw defendant about noon on April 21 and again about two hours later.

In rebuttal the State called Investigator Lindsey, who testified that he had interviewed Ms. Lewis on April 23 and she did not state that she had seen the defendant at noon and 2 p.m., but only remembered that it was afternoon.

■ We need not rehash all of the foregoing in dealing with the question of reasonable doubt. Defendant has made no argument con-

cerning reasonable doubt on the theft convictions. Therefore, that matter is waived under Supreme Court Rule 341(e)(7) (87 Ill. 2d R. 341(e)(7)). There can be no contention but that the case insofar as the kidnapings and the murders are concerned was largely circumstantial, but the entire matter was submitted to the jury with the complete Illinois Pattern Jury Instruction, Criminal, No. 3.02 (2d ed. 1981), which directed them to eliminate any possible theory of innocence. Defendant had the motive, robbery, together with knowledge of the household from having lived there. His past conduct relative to Hauptman's money cries out against him. Defendant admitted a connection with the blue pickup truck which was discovered with the bodies. He was seen in the truck on the evening preceding the murders. One fitting his general description was seen in the blue truck shortly before the children were sent to the post office in the general area. The pry bar, which the owner of the truck testified was kept in its glove compartment, was accessible to him as a weapon. One fitting defendant's general description was found hitchhiking in the area of the crime scene shortly after the estimated time of death. His whereabouts on April 20, 21, and 22 were largely accounted for and consonant with the commission of the crimes. His interest in the dumping area afterwards seems far too coincidental. By pointing out a few of these salient items, we do not ignore the rest. The circumstantial case here was extremely strong. We find altogether appropriate the words of the supreme court in *People v. Williams* (1977), 66 Ill. 2d 478, 484-85, 363 N.E.2d 801, 804, also a multiple homicide case based on circumstantial evidence:

> "We find apposite here the statement in *People v. Marino* [1970], 44 Ill. 2d 562, 580, that 'it is well settled that the commission of an offense may be established entirely by circumstantial evidence. As we observed in *People v. Bernette* [1964], 30 Ill. 2d 359, 367, "a conviction may be sustained upon circumstantial evidence as well as direct evidence, (*People v. Russell* [1959], 17 Ill. 2d 328,) it being necessary only that the proof of circumstances must be of a conclusive nature and tendency leading, on the whole, to a satisfactory conclusion and producing a reasonable and moral certainty that the accused and no one else committed the crime. (*People v. Magnafichi* [1956], 9 Ill. 2d 169; *People v. Grizzel* [1943], 382 Ill. 11.) The jury need not be satisfied beyond a reasonable doubt as to each link in the chain of circumstances relied upon to establish guilt, but it is sufficient if all the evidence, taken together, satisfies the jury beyond a reasonable doubt of the accused's guilt." '

Proof of guilt beyond a reasonable doubt does not require proof beyond any possibility of a doubt. (*People v. Hanson* [1935], [3]59 Ill. 266; *People v. Branion* [1970], 47 Ill. 2d 70.) From our examination of the record we conclude that the evidence is sufficient to prove guilt of both defendants of both murders beyond a reasonable doubt."

We turn next to the question regarding the stopping of the defendant. He maintains that the officers had no probable cause to stop and detain him and consequently the trial court was in error in denying his motion to quash his arrest. He further argues that the arrest being illegal, all evidence obtained subsequent thereto should be suppressed and that the trial court was likewise in error in denying the companion motion to suppress. We disagree.

The trial court sustained the arrest as a traffic violation. This was erroneous; however, we are not concerned with the reasons assigned by the trial court for its action, but rather with the correctness of its result. *People v. Church* (1981), 102 Ill. App. 3d 155, 429 N.E.2d 577.

Craig testified that after receiving the radio dispatch from Fillmore it was his intention to stop the defendant and issue a warning for failure to dim headlights. After the stop matters escalated as described above. There was no traffic violation. Section 12—210 of the Illinois Vehicle Code (Ill. Rev. Stat. 1981, ch. 95½, par. 12—210) requires a driver to dim his headlights when an approaching vehicle from the opposite direction is within 500 feet of him, or when a driver is within 300 feet of a vehicle traveling in the same direction. Neither condition was present here. Both Craig and Kistner were in stopped vehicles, Craig in a perpendicular side road and Kistner on the shoulder of the blacktop.

The stop was proper as an investigative one under *Terry v. Ohio* (1968), 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868. The defendant had driven past the dump area three times and had slowed his vehicle each time at the road leading into it. All this had occurred late at night when the ordinary individual would have no legitimate reason to visit the dump. Two of these actions had occurred while Harbison was on watch and the third while Fillmore was there, and it was Fillmore's dispatch to Craig which led to the stop. Defendant argues that Fillmore had no information beyond the single incident which occurred on his watch and therefore a *Terry*-type stop was unwarranted. The record is otherwise. At the hearing on the motion to quash Harbison testified as follows on cross-examination:

"Q. [By the prosecutor] Were you relieved of your post there by Officer Fillmore very shortly after seeing this green vehicle

the second time?

A. Yes.

Q. Did you, as you recall, in any fashion run the 1028 [a license check] or communicate the information you had to any of the officers that relieved you?

A. I relayed that information that I had seen this vehicle go by very slow and that we were going to run the 28. And I relayed that information on to the other officers."

■ When police officers are working together, as they were here, the knowledge of each is the knowledge of all. (*People v. Kite* (1981), 97 Ill. App. 3d 817, 423 N.E.2d 524.) The reasonable suspicion necessary to stop a defendant may be established on the basis of all the police working in concert. (See *People v. Johnson* (1982), 104 Ill. App. 3d 572, 432 N.E.2d 1232.) Craig's particularized reason for making the stop is not significant. He was informed that the vehicle was acting suspiciously. This was based on Harbison's observations, communicated to Fillmore, who in turn communicated to Craig. The fact that Fillmore stated only the ultimate fact, "suspicious," does not undermine Craig's action. It was based upon the aggregated and cumulative knowledge of several officers.

■ Defendant next argues that he was illegally taken into custody when he was handcuffed and transported to headquarters for questioning. He emphasizes, and we agree, that handcuffing is a serious restraint upon liberty. However, the record is clear that he consented to it and only moments later the officers were informed by radio that the camper which he had been driving was stolen. The case is thus unlike *People v. Townes* (1982), 91 Ill. 2d 32, 435 N.E.2d 103, upon which he relies. In that case the defendant was detained by the police and questioned over a 12-hour period until probable cause was then generated. Here the detention, even assuming it was involuntary, and probable cause occurred almost simultaneously. Although Kistner's assigned reason at the time for handcuffing the defendant was departmental policy, within an exceedingly short time thereafter, concrete probable cause appeared.

The Supreme Court in *United States v. Mendenhall* (1980), 446 U.S. 544, 64 L. Ed. 2d 497, 100 S. Ct. 1870, has held that one may voluntarily accompany police officers from the scene of an investigative stop and consent to a strip search without the situation developing into an unlawful arrest. Our own supreme court has held that detention and transportation is a legitimate investigative procedure even in the absence of probable cause. *People v. Lippert* (1982), 89 Ill. 2d 171, 432 N.E.2d 605.

Other authorities relied upon by defendant (*People v. Shaver* (1979), 77 Ill. App. 3d 709, 396 N.E. 2d 643; *People v. Gabbard* (1979), 78 Ill. 2d 88, 398 N.E.2d 574) are distinguishable. In neither of those cases did the defendant manifest a consent to be handcuffed.

Defendant was legally stopped and legally detained and transported. There is thus no basis for the application of the exclusionary rule to the evidence gathered subsequently thereto.

Defendant's next contention concerns the selection of the jury. He argues that since the jury was "death qualified," *i.e.*, that each juror indicated a willingness to impose the death penalty under proper circumstances (something which the jury ultimately declined to do), it was not representational of the community and was conviction-prone and thus he was deprived of a fair trial. We do not agree, and note in passing that the issue was not raised in his post-trial motion.

The matter is controlled by *Witherspoon v. Illinois* (1968), 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770, in which the Supreme Court held that the exclusion of jurors in capital cases merely because of conscientious scruples against the death penalty produced a death-prone jury, which was unconstitutional. However, the court rejected the argument that such a jury would be unrepresentative or unduly conviction-prone. Our supreme court has recently held that *Witherspoon* remains valid. *People v. Williams* (1983), 97 Ill. 2d 252.

The defendant has presented no evidence that this jury was prone to convict. Each side made extensive use of peremptory challenges, apparently based on the jurors' views concerning the death penalty. Only three veniremen were excused for cause; defendant failed to object to two or these, one of whom was an alternate, and no alternates were used. Thus only one juror was excused for cause over defendant's objection. This one stated that he could not be impartial, that he had some knowledge of the case, and that he would vote against the death penalty under any circumstances. The dismissal for cause was appropriate apart from any question of death penalty.

Defendant's final argument centers upon the constitutionality of the statute under which he was sentenced to life imprisonment, section 5—8—1(a)(1) of the Unified Code of Corrections. (Ill. Rev. Stat. 1981, ch. 38, par. 1005—8—1(a)(1).) That section in fact contains three subsections: (a) which provides for a term of 20 to 40 years for murder; (b) which provides for a discretionary term of natural life if the murder was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty, or if any of the aggravating factors found in section 9—1 of the Criminal Code of 1961 (Ill. Rev. Stat.

1981, ch. 38, par. 9—1) is present; and (c) which provides for a mandatory term of natural life if the defendant has previously been convicted of murder, or is found guilty of murdering more than one victim. Defendant's brief confines itself to argument relating to the second alternate in subparagraph (c), *i.e.*, multiple victims. We therefore find that he has waived any argument relating to the other subparagraphs and their subsections, even though he makes a general allegation as to the entire section 5—8—1(a)(1). 87 Ill. 2d R. 341(e)(7).

We have searched the record in vain in an effort to determine whether the issue was raised at the trial level and have been unable to find any such indication. There were extensive motions concerning the constitutionality of the death penalty statute (Ill. Rev. Stat. 1981, ch. 38, pars. 9—1(b), (c)) but nothing regarding life imprisonment. The post-trial motion is cast in general terms insufficient to raise the issue. We would, therefore, be justified in deeming it waived. *People v. Amerman* (1971), 50 Ill. 2d 196, 279 N.E.2d 353.

However, the State has not argued waiver, so we feel obliged to discuss the matter briefly. Defendant's argument centers on the mandatory nature of section 5—8—1(a)(1)(c), which provides that the court "shall" sentence the defendant to life imprisonment. He maintains that this is a conclusive presumption that a defendant convicted of multiple murders is unworthy ever to be returned to society and this offends article I, section 11 of the Illinois Constitution of 1970, which provides that all penalties shall be determined with a view towards the seriousness of the offense and the objective of restoring the offender to useful citizenship.

By placing a narrow focus on one alternative of section 5—8—1(a)(1)(c) the defendant ignores that alternative bases used by the trial court in fixing its sentence. The court's remarks in sentencing are instructive:

> "In regard to the offenses of murder, in addition to the findings that the court has already made, the Court finds the defendant has been convicted of murdering two individuals, that these murders were with the intent to kill more than one person, that the murdered individuals were killed in the commission of the felony offense of aggravated kidnapping, and the defendant killed these two individuals with the intent or the knowledge that his acts would cause death or that they created a strong possibility of death.
>
> The Court further finds that the two murdered individuals were under the age of sixteen years of age and that again without reason, with a complete disregard to human life, the defend-

ant's acts were exceptionally brutal and heinous and indicative of wanton cruelty.

For these reasons, in addition to the statutory mandate, the Court will sentence the defendant to natural life imprisonment for the offenses of murder of Mary Roughton and Russell Roughton."

The court was clearly proceeding not only under subparagraph (c), but also under subparagraph (b) of section 5—8—1(a)(1), subparagraph (b) being permissive—"may." There is no constitutional impediment to a discretionary life sentence. *People v. La Pointe* (1981), 88 Ill. 2d 482, 431 N.E.2d 344.

Thus, by finding that the murders occurred in the course of committing the felony of aggravated kidnaping the court was making the proper interplay between subparagraph (b), which makes a life sentence discretionary if any aggravating factor is found, and sections 9—1(b)(3) and (6)(c) of the Criminal Code of 1961 (Ill. Rev. Stat. 1981, ch. 38, pars. 9—1(b)(3), (6)(c)), which provide as aggravating factors multiple murders and murder in the course of aggravated kidnaping. Additionally, the court made a finding under the other alternative of subparagraph (b) that the murders were accompanied by exceptionally brutal and heinous conduct indicative of wanton cruelty.

This case is thus distinguishable from *People v. Taylor* (1983), 115 Ill. App. 3d 621, wherein the appellate court concluded that the word "shall" in subsection (c) was discretionary because the trial court felt it had no alternative. Here alternate bases for sustaining a life sentence not only exist, they are spelled out in the record.

For all the foregoing reasons, the judgment and sentence of the circuit court of McLean County are affirmed.

Affirmed.

MILLS and MILLER, JJ., concur.