THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. TYRONE K. SHAW, Defendant-Appellant.

First District (5th Division)   No. 83—2940

Opinion filed May 17, 1985.

Angelo Ruggiero, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat and Mary Ellen Dienes, Assistant State's Attorneys, of counsel), for the People.

JUSTICE SULLIVAN delivered the opinion of the court:
Following a jury trial, defendant was convicted of two counts of

theft and sentenced to consecutive four-year terms. On appeal, he contends that (1) the trial court erred (a) in not dismissing one of the indictments because there was no grand jury testimony concerning his involvement and because a witness' testimony before the grand jury was perjured, (b) in admitting into evidence photographs of the vehicles involved in the offenses as well as certain business records, and (c) in allowing two State's witnesses to testify concerning certain documents and to give expert testimony; (2) he was denied a fair trial when a mistrial was refused after a witness testified concerning newspaper articles about insurance fraud; (3) he was not proved guilty beyond a reasonable doubt; and (4) he was improperly sentenced to consecutive terms.

It appears that on February 11, 1980, Anthony Capinegro drove his white 1979 Lincoln Mark V, vehicle identification number (VIN) 9 Y89S615650, into a tree. His insurance company—Allstate—paid him on the basis that the car was a total loss, and it was then sold for salvage. Then, on July 13, 1980, defendant went to a Chicago police station and filed an accident report, stating that while driving a white 1979 Lincoln Mark V having the same VIN—9Y89S615650—he was struck by a Hunt's U-Drive rental truck. He returned to the station the next day to report that the car radio had been taken from the car while it was parked at the scene of the accident. Thereafter, defendant settled his claim against Hunt's, receiving two checks from them—one for $7,350 and the other for $383.

On July 26, 1980, a man identifying himself as Stansbury, who was later identified as defendant, walked into a different police station and reported that his white 1979 Lincoln Mark V—subsequently determined to have the same VIN as the Capinegro car—had been involved in a collision with a Ryder Truck Company rental truck. Two days later, he returned to the police station to report that his car radio was taken while he was reporting the accident. He settled his claim for damages because of this incident with Earl Podolsky of Ryder Truck Company, receiving a check in the amount of $8,286—which the record shows was deposited into the savings account of defendant's wife.

Capinegro testified that on February 11, 1980, he was driving his white 1979 Lincoln Mark V on the driveway to his home when the car skidded on some ice on a hill, bounced off a small tree, and smashed into a larger tree. His insurance carrier—Allstate Insurance Company—notified him that they considered the car a total loss, and after receiving a $12,640.25 check for the vehicle, he transferred the title to Allstate. He testified that three sets of photographs—People's

group exhibits A, B, and C—[1] portrayed the condition of his car as he observed it upon returning from the hospital, except that the hood of the car was missing in groups B and C. He also testified that the crack in the windshield depicted in groups B and C showed where he hit his head.

Brian Hanson, the property unit claims manager for Allstate, testified that one of his responsibilities was Allstate's total loss unit, which, among other things, appraised vehicles when the damages exceeded the value of the car itself. In this case, he authorized the classification of Capinegro's car as a total loss, and payment was made on that basis; Allstate then sold the car for salvage to A-1 Auto Sales without doing any repair work on it. He testified also that photo groups A, B, and C depicted the same automobile and that, based on his 12 years of experience, the damage shown in the B group of photographs was not caused by an automobile or a truck but by contact with some type of large cylindrical object such as a pole or a tree. He testified, on redirect examination, that the differences he saw in the photographs showed the different angles used by the photographers, rather than any actual difference in the damages, and that, although the angles made comparison more difficult, he had no doubt that the damages were the same in all three groups of photographs.

Officer Peron testified that defendant and another individual came into the station on July 13, 1980, to report an accident, and they made out an accident report stating that their vehicle was struck broadside by the rental truck. Defendant also told him that the people in his car had been injured and were going to the hospital after he finished reporting the accident.

Officer Demaar testified that defendant came into the station on July 14, 1980, to report that the radio had been taken from his car while it was parked at the scene of the accident.

Farron Brougher, a casualty claims adjuster for General Adjustment Bureau, whose position involved investigation, evaluation, and settlement of such casualty claims, testified concerning the contents of his company's file on the adjustment of the reported accident on July 13, 1980, involving defendant and the Hunt's truck, driven by Richard Breakfield. Brougher stated that the repair estimate for the Lincoln was $10,741 and the point of contact was the front end.

---

[1]Group A photographs, taken on February 22, 1980, by Allstate (the February 11, 1980, accident); Group B, taken July 22, 1980, by General Adjustment Bureau (the alleged July 13, 1980, accident); and Group C, taken August 8, 1980, by Independent Auto Appraisers (the alleged July 26, 1980, accident).

Brougher settled the claim of defendant for $7,350 and also paid $383 for defendant's son's personal injury claim.

Hector Hunt, president of Hunt's U-Drive truck rental, testified that Richard Breakfield rented a truck on July 12, 1980, and returned the truck on July 13, 1980. Hunt's procedure upon both rental and return of a truck requires an employee to walk around the truck to check for damage and to make a notation on the rental contract if there is any such damage to the truck. This rental contract did not have such a notation, and after he found out that the truck was reported to have been involved in an accident, Hunt notified his attorney and also asked General Adjustment Bureau to investigate the incident. He also stated that he personally inspects a truck if it has been involved in an accident where there is a possibility of personal injury, and he did so here on the day after the truck was returned and found the condition of the truck to be the same as it was prior to the rental, with no apparent additional damage. Hunt told his law firm that the truck was not damaged, but his company eventually settled with defendant, his son, and defendant's two passengers.

Officer Pearson testified that he handled a walk-in traffic accident report on July 26, 1980, involving an International truck driven by a Mr. Paige, a 1979 Lincoln (having the same VIN as the Capinegro car) driven by Mr. Stansbury, and a Volkswagen. He testified that front-end damage was reported on the Lincoln.

Officer Marva Smith testified that two individuals came into the station on July 28, 1980, one of whom identified himself as Edward Stansbury and reported that his car radio was taken from his car after he had an accident on July 26, 1980. Officer Smith also testified that she had seen both individuals on July 26 when they came to the station to report the original accident, and she identified defendant as the individual who had given his name as Edward Stansbury.

Earl Podolsky, a safety manager for Ryder Truck Rental, testified that the truck allegedly involved in the July 26, 1980, accident was rented by Carlos Paige on that same day and, although the rental contract indicated that the truck was "dispatched with damage," no additional damage to the right front corner was noted on the contract when the truck was returned. Two days after the Ryder accident report was made, Podolsky received a telephone call from the individual who was driving the Lincoln, and after discussing the incident with him, Podolsky called Independent Auto Appraisers to obtain an estimate on the collision repairs. The photographs of the truck showed only minor damage, such as a bent bumper, scrapes on the fender, and scrapes at the rear of the hood. He also testified that he told "Edward Stans-

bury" in person at the Ryder offices on August 18, 1980, that he would have to have proof of title before the claim could be finalized. "Edward Stansbury" also gave Podolsky a new address at that time—2111 East 83rd Street—which the record indicates is the address of defendant. Podolsky testified that he also spoke to "Mr. Stansbury" on August 26, when the latter signed a release of his claim against Ryder and received its check in settlement. Podolsky identified defendant as the individual with whom he spoke at the Ryder offices and who had given his name as Edward Stansbury. On cross-examination, he stated that the Ryder file contained a certificate of title for the 1979 Lincoln Continental which listed the VIN as 9Y89S615650, the purchase date of the vehicle as June 8, 1980, the issue date of the certificate as July 3, 1980, and the name and address of the owner as Edward Stansbury of 2208 East 68th Street.

Don Baron, formerly employed as an appraiser by Auto Damage Appraisers, testified that he followed normal procedures during the appraisal of the 1979 Lincoln for Ryder truck, which included taking photographs of its damaged areas, and he suggested to Ryder that the car be considered a total loss. He also testified that the condition of the damage shown in People's group exhibit B was very similar to the damage in the group exhibit C photographs taken by Auto Damage Appraisers. He testified that the point of impact seemed to be identical in exhibits A—2, B—1, and C—2; that from the damage it looked like the car hit a post, a tree, or a fireplug; and that, if the Ryder truck did the damage depicted in the photographs of the Lincoln, the truck would have suffered more damage because it had a fiberglass hood or nose. He did not believe that the damage on the truck was related to the damage to the Continental. On cross-examination, he stated that in photographs A—2 and B—1, the grill, head, mirror, and bumper guard were not in the same position in both pictures, and he agreed to several other minor discrepancies pointed out by defense counsel. He also stated that several of the items appeared to be at a different angle because the car was photographed from different angles. On redirect examination, he testified that if the Lincoln had been repaired after the July 13 incident, it would have taken at least a month for such extensive repairs. He concluded that it seemed to him that A—2, B—1, and C—2 were photographs of the same vehicle and that similar damage was involved.

Lillie Burrows, legal records coordinator at First National Bank of Chicago, testified that according to the bank's records, a check in the amount of $8,286, payable to Edward Stansbury and carrying an endorsement by him, was deposited in Lavon Rena Shaw's account on

August 28, 1980.

Defendant testified that on July 13, 1980, he was on his way to White Castle with William Roberson, Anthony Nix, and his son—Terrance Shaw—when the automobile he was driving was struck by a Hunt's truck. Defendant, his son and William Roberson went to Jackson Park Hospital, where X rays were taken of his hand and his son's head, and he received, in addition, treatment for contusions on his scalp. He stated further that on July 13, the car he was driving—a white 1979 Lincoln Mark V—was owned by Edward Stansbury but that the license plate on the Lincoln was one of the two plates assigned to defendant's Mercury Cougar. The plate was on the Lincoln at the time of the accident because he was in the process of purchasing the Lincoln from Stansbury, but the sale was never consummated. Farron Brougher contacted him about his claim against Hunt's U-Drive, and after several conversations with him, defendant received a check from Brougher in settlement of his claim. He also testified that he returned the Lincoln to Stansbury after the accident and that he kept only a small amount of the $7,350 he received from Hunt's. He denied any involvement in the July 26, 1980, accident with Carlos Paige and also denied having any conversations with Earl Podolsky.

On cross-examination, defendant stated that although he had seen him at an auto auction sometime before the accident, he had never had a conversation or any business delayings with Breakfield—the driver of the Hunt's truck—prior to the accident, but he did sell Breakfield a 1977 Cadillac seven months after the accident. He met Carlos Paige after the accident, and although Stansbury himself did not tell him about the accident, he had heard that Stansbury—while driving the Lincoln Continental—had been involved in an accident with Carlos Paige; Stansbury had previously purchased cars from him. Defendant also stated that he bought a 1978 Lincoln on July 16, 1980, at an auction and titled the car in his name, but denied that he eventually transferred the title to Stansbury. After the prosecutor produced a copy of the title, however, defendant admitted that he sold the 1978 Lincoln to Edward Stansbury in 1981, while keeping a lien on it. Defendant further stated that his wife knew Edward Stansbury and, although she did not socialize with him, she did cash the Ryder check for Stansbury in August 1980 and, after she put the check through her account, she gave the money to Stansbury after keeping "a couple of hundred dollars" for cashing the check.

Jeffrey Louber, a forensic scientist employed by the Illinois Department of Law Enforcement as a document examiner, called by the defense, testified that his position requires him to compare handwriting,

and that he was asked by the prosecution to compare certain documents in this case. He examined over 100 exemplars of known handwriting from defendant and comparable handwriting, as well as the reproduction of the name Edward Stansbury by defendant in his own handwriting. He compared those with the Stansbury signature on the Ryder release forms and with the Stansbury endorsement on the Ryder check. He did not identify either of the signatures as defendant's handwriting, but stated that although he was unable to come to a definite conclusion because of the unnatural appearance of the comparable handwriting in conjunction with the apparent pen failure within the Stansbury endorsement, he did find similarities between defendant's known handwriting on both the endorsement and release forms. By "unnatural" he meant that there was distortion in the handwriting submitted. He stated also that the exemplar in which defendant wrote the name Edward Stansbury varied greatly from other examples of defendant's known handwriting and, assuming that defendant was neither sick nor physically handicapped, he would conclude that he had disguised his writing when he wrote the Stansbury signature to be used for comparison. He admitted that if someone was simply nervous, the inconsistencies would be present throughout all of the known writing, but in this case many of the inconsistencies were limited to the "Edward Stansbury" exemplar.

Ronald Schillaci, who had worked in the body and fender business for 27 years, testified for the defense that the angle of the header panel in group exhibit A was different than the angle in exhibit B—1; the curvature of the bumper and bumper cushion was more pronounced in exhibit A; the filler panel is hanging straight down in one photograph but is bent backwards in exhibit B; and the bumper is bent backwards in one of the photographs. He also testified that the damage in exhibit A looked like it was caused by a cylindrical object, but the damage in exhibit B appeared to have been caused by some blunt or square object. He opined that the damage in exhibits A and B had been caused by different accidents, but he was unsure about any differences in the damage shown in exhibits B and C.

OPINION

■ Defendant first contends that the trial court erred in refusing to grant his motion to dismiss the indictment in 82 C 8541, which covered the Ryder truck collision of July 26, 1980. He argues that because Richard Breakfield's grand jury testimony was false, the indictment should have been dismissed. He is correct in asserting that a court may properly dismiss an indictment based upon perjured testimony (see

*People v. Rivera* (1979), 72 Ill. App. 3d 1027, 390 N.E.2d 1259), but a court must proceed with restraint in ascertaining due process violations in indictment procedures and should dismiss an indictment only when the violation is clear and has been found with certainty (*People v. Lawson* (1977), 67 Ill. 2d 449, 367 N.E.2d 1244; *People v. Bragg* (1984), 126 Ill. App. 3d 826, 467 N.E.2d 1004). Here, after Breakfield had testified before the grand jury that, while using the name Edward Stansbury, he had fraudulently obtained a draft from Ryder Truck Rental for the alleged accident on July 26, 1980, a subsequent investigation disclosed that it was defendant—not Breakfield—who had obtained the check from Ryder by using the name Edward Stansbury. However, because there is no indication in the record that Breakfield knew at the time he testified that his testimony was incorrect, defendant's reliance on Breakfield's mistaken testimony to establish perjury, and thus a denial of due process, is misplaced. (See Ill. Rev. Stat. 1983, ch. 38, par. 32—2.) In this regard, the record indicates that this grand jury heard testimony on multiple instances of insurance fraud or theft from individuals who used several aliases in order to further their plans. In its response to defendant's motion to dismiss the indictment, the prosecution referred the trial court to testimony by Breakfield concerning approximately 30 such incidents involving this defendant, including three with Ryder Truck Company. Under such circumstances, the trial court reasonably could have believed that Breakfield was mistaken regarding his role in this particular incident, and thus correctly found that his misstatement did not rise to the level of perjury. See also *People v. Palmer* (1982), 111 Ill. App. 3d 800, 444 N.E.2d 678.

■ Defendant also argues that there was no evidence before the grand jury to connect defendant to the theft charge for the July 26, 1980, incident. While a trial court has inherent supervisory authority to review grand jury transcripts and may dismiss an indictment which is not supported by *any* evidence (*People v. Rodgers* (1982), 92 Ill. 2d 283, 442 N.E.2d 240), it is not necessary that evidence be presented for each element of the offense but only that there be some evidence relative to the charge (92 Ill. 2d 283, 442 N.E.2d 240). Here, the grand jury heard testimony regarding defendant's connection with multiple incidents involving similar "accidents" for over four months, including the testimony of Carlos Paige that defendant told him what to say for the police accident report and in the claim for damages against the truck rental company in the July 26, 1980, Ryder truck incident. Paige's testimony clearly connected defendant to this specific incident. We further note that although Breakfield testified that he was the person who actually received the check from Ryder, he also said that he cashed the

check with the assistance of and under the direction of defendant, and that he—Breakfield—only received a cancellation of a gambling debt or a couple hundred dollars for his role. Whether or not Breakfield was actually the individual who physically accepted the check from Ryder in this case, the grand jury testimony does show that defendant took part in planning and carrying out the July 26 Ryder scheme and indicated that he received money for his part in the scheme. We find the evidence satisfies the standard established by the Illinois Supreme Court in *Rodgers* as it does "tend to connect" defendant to the Ryder theft.

■ Defendant next contends that the trial court erred in admitting People's group exhibits A, B, and C, which were photographs of the 1979 Lincoln Continental. We disagree. In support of his contention, defendant argues they were inadmissible for lack of foundation, but it is well established that a proper foundation for photographs is laid where they are "identified by a witness as a portrayal of certain facts relevant to the issue and verified by such witness on personal knowledge as a correct representation of the facts." (*People v. Thomas* (1967), 88 Ill. App. 2d 71, 80, 232 N.E.2d 259, 264.) We believe there was sufficient foundation in the testimony of Capinegro that he inspected his vehicle shortly after the accident and testified that the photographs accurately portrayed his 1979 Lincoln as it looked at that time.

Defendant also argues that foundation was lacking for the admission of People's group exhibits B—21 and C—9, photographs of the Hunt's and Ryder trucks. However, we believe that proper foundation was provided in the testimony of Hector Hunt, president of Hunt's U-Drive, and Earl Podolsky, safety manager for Ryder Truck Company. Each testified to a personal inspection of his company's truck immediately after learning that it had been involved in an accident and that the photographs, group exhibits B and C respectively, correctly showed the condition of their vehicles at that time.

■ Defendant, in challenging the admission over his objection of various business records, contends that the trial court improperly allowed testimony regarding the contents of those records. He first argues that documents from Allstate's file concerning Capinegro's claim were improperly admitted. Those documents are (1) a loss report filled out by an Allstate adjuster; (2) a group estimate prepared by an adjuster from Allstate's total loss unit; (3) Allstate's total loss and salvage evaluation form; (4) Allstate's sight draft; (5) a mileage odometer statement in which Capinegro certified the mileage on the Lincoln at the time he transferred title to Allstate; and (6) another odometer statement in which Allstate certified the mileage on the Lincoln before

transferring title to the salvage company. The foundation required for admission under the business records exception to the hearsay rule is that (1) the writing or record was made as a memorandum or record of the act, transaction, occurrence, or event; (2) it was made in the regular course of business; and (3) it was the regular course of such business to make such a record at the time of the transaction or within a reasonable time thereafter. Ill. Rev. Stat. 1983, ch. 38, par. 115—5(a).

Defendant initially maintains that there was no testimony that the documents were prepared in the ordinary course of the business of All-state at or near the time of the transaction. However, we note that Brian Hanson, a property unit claim manager for Allstate who testified that the documents were all used in the adjustment of Capinegro's claim, also established the necessary foundation in the following colloquy during his testimony:

"Q. Are those documents that are made in the normal course of business of All State Insurance Company when a claim is adjusted?

A. Yes.

\* \* \*

Q. Now, are the entries that are made on those business records of All State Insurance Company made at or near the time of the transaction to which those entries refer in the normal course of business?

A. Yes. They are all made at the dates that are written."

Defendant additionally argues that Hanson had no personal knowledge of the records, but we find such argument to be equally meritless, since the witness not only testified that he was personally involved in and knew that the documents were used in the adjustment of Capinegro's claim, but also stated that his personal signature appeared on some of the forms. We find that the documents from the Allstate file were properly admitted into evidence.

We also see no merit in the additional argument of defendant that once the documents were admitted into evidence, Hanson should not have been allowed to testify regarding them. Defendant refers us to *Smith v. Williams* (1975), 34 Ill. App. 3d 677, 339 N.E.2d 10, which we find inapposite. Held inadmissible in *Smith* was the testimony of a witness who constantly referred to the contents of a file not in evidence. It is our view that *Smith* has no application here, where Brian Hanson simply referred to items which were properly admitted into evidence and upon which he personally relied during his adjustment of the claim.

Defendant raises the same objection with respect to admission of People's exhibits B—16, B—17, B—19, and B—20, documents entered

into evidence during the testimony of Farron Brougher. The State correctly points out, however, that the trial court specifically asked whether defendant had any objections to admission of these exhibits, and defendant replied in the negative. He has thus waived the issue for purposes of appeal. See *People v. Rhoads* (1982), 110 Ill. App. 3d 1107, 443 N.E.2d 673.

■ Defendant also argues that People's exhibits C—6, C—7, C—7a, and C—8 were improperly admitted. He failed to object, however, to exhibit C—8 despite questioning by the trial court, and he has therefore waived this issue with respect to exhibit C—8. (*People v. Rhoads* (1982), 110 Ill. App. 3d 1107, 443 N.E.2d 673.) The other exhibits are: (1) C—6, a rental contract for the Ryder truck allegedly involved in the July 26 accident; (2) C—7, a Ryder accident report; and (3) C—7a, a carbon copy of C—7. Earl Podolsky testified that the items were filled out and used by Ryder personnel in the ordinary course of its business. His testimony regarding Ryder procedures also indicated that rental contracts were generated at the time a truck was rented and that accident reports were filled out at the time the information was received by Ryder. As previously discussed with respect to the Allstate file documents, such testimony constitutes a proper foundation for admission of business records. We also note that, at trial, defendant objected to admission of the Ryder documents by asserting that since Earl Podolsky did not personally fill out the forms, he was not the proper witness to provide foundation testimony. Such argument is without merit (see *People v. Clark* (1982), 108 Ill. App. 3d 1071, 440 N.E.2d 387), and we find that exhibits C—6, C—7, and C—7a were properly admitted.

■ Defendant's contention that the trial court erred in allowing expert testimony which compared the damage to the Lincoln as depicted in People's group exhibits A, B, and C is meritless. He argues that Brian Hanson, who handled adjustment of Capinegro's insurance claim for Allstate and who was qualified as an expert in the area of auto adjusting and repair, should not have been allowed to compare the damage portrayed in the photographs. In support of his argument, defendant extracts information from cross-examination of Hanson, such as his lack of training regarding oxidation of bare materials and certain qualifying statements offered in explanation of the repair estimate. Such items clearly may affect the expert's level of certainty, but it is well established that lack of absolute certainty goes to the weight of the testimony, not to the admissibility. (See *People v. Columbo* (1983), 118 Ill. App. 3d 882, 963, 455 N.E.2d 733, 791, *cert. denied* (1984), 467 U.S. 1208, 81 L. Ed. 2d 351, 104 S. Ct. 2394.) Defendant's further argument that *Wilson v. Clark* (1981), 84 Ill. 2d 186, 417

N.E.2d 1322, *cert. denied* (1981), 454 U.S. 836, 70 L. Ed. 2d 117, 102 S. Ct. 140, which adopted Federal Rules of Evidence 703 and 705, prohibits an opinion based on the photographs is not well taken. Rule 703 provides in part: "If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence." (Fed. R. Evid. 703.) Rule 705, in pertinent part, states: "The expert may testify in terms of opinion or inference and give his reasons therefor without prior disclosure of the underlying facts or data, unless the court requires otherwise." (Fed. R. Evid. 705.) As stated by the supreme court in *Wilson v. Clark*, "[u]nder Rule 705 the burden is placed upon the adverse party during cross-examination to elicit the facts underlying the expert opinion. [Citations.]" (*Wilson v. Clark* (1981), 84 Ill. 2d 186, 194, 417 N.E.2d 1322, 1327, *cert. denied* (1981), 454 U.S. 836, 70 L. Ed. 2d 117, 102 S. Ct. 140.) Here, we have previously determined that the photographs relied upon by Brian Hanson were properly admitted into evidence, and we note that photographs are precisely the type of information relied upon by accident reconstruction experts. (See *Fontanne v. Federal Paper Board Co.* (1982), 105 Ill. App. 3d 306, 434 N.E.2d 331.) We thus find that the expert testimony on the comparison of the damage portrayed in the photographs was properly received. Defendant raises the same issue with respect to the expert testimony of Don Baron, who worked for Auto Damage Appraisers and appraised the damages on the Lincoln for Ryder, and for the same reasons stated in our discussion of Brian Hanson's testimony, we find the testimony of Don Baron was also properly admitted.

■ Defendant further posits that the trial court erred by not granting its motion for a mistrial when Earl Podolsky testified about newspaper articles which discussed the insurance fraud scheme which was the basis for this investigation and the subsequent charges. Combined with the effect of this testimony, he also posits that the prosecutor's mention of insurance fraud in closing argument prejudiced defendant's right to a fair trial. It is well established, however, that a defendant cannot complain on appeal about testimony which he procured or invited. (*People v. Jones* (1983), 119 Ill. App. 3d 615, 456 N.E.2d 926.) Here, the testimony complained of by defendant was initially elicited during his cross-examination of Podolsky. Not only did the subject of the insurance fraud article come up in response to defense counsel's own questioning, but he continued to elicit information from Podolsky about the article. Defendant cannot now complain that Podolsky's testimony about the article, on redirect examination, required a mistrial.

■ Regarding the prosecutor's comment on insurance fraud during closing argument, we note that defendant failed to object to such comments, and any error is waived by such failure to make timely objection during trial. (See *People v. Bartall* (1983), 98 Ill. 2d 294, 456 N.E.2d 59.) We additionally note that defendant's inclusion of the prosecutor's comment issue by insertion of a single sentence in his brief without supporting argument or citation of authority does not comply with Supreme Court Rule 341(e)(7) (87 Ill. 2d R. 341(e)(7)), and since defendant made no argument for this issue in his brief, the issue is waived despite his general allegation of error. (See *People v. Hobson* (1983), 117 Ill. App. 3d 191, 452 N.E.2d 771.) Moreover, "[a]n accused cannot interject an issue into a case and then argue that it was error to bring the issue to the jury's attention." (*People v. Jones* (1983), 119 Ill. App. 3d 615, 628, 456 N.E.2d 926, 936.) We do not believe that defendant was deprived of a fair trial by the prosecutor's reference to an issue interjected into the trial by defendant.

■ We turn then to defendant's contention that he was not proved guilty beyond a reasonable doubt, and we note that he presents no authority and very little argument on this issue. It is well established that where a defendant seeks reversal, theories not advanced with citation of authority are deemed waived (*People v. Ramirez* (1983), 98 Ill. 2d 439, 457 N.E.2d 31), and here, defendant merely asserts that the prosecution has not proved that the Hunt's accident did not occur and has not proved that defendant was even involved in the Ryder incident. Such argument is not only waived because not in compliance with Supreme Court Rule 341(e)(7) (see also *People v. Ramirez* (1983), 98 Ill. 2d 439, 457 N.E.2d 31), but is also meritless, since its effect would hinder the prosecution and perhaps preclude conviction of crimes such as this one unless a codefendant could be induced into testifying against his partners. It is well established that the State may prove its case by circumstantial as well as direct evidence, and the jury may draw all reasonable inferences from such evidence. (*People v. Castro* (1983), 113 Ill. App. 3d 265, 446 N.E.2d 1267.) Moreover, a jury verdict will not be reversed unless evidence is so unreasonable, improbable, or unsatisfactory that it justifies reasonable doubt of defendant's guilt. (*People v. Winfield* (1983), 113 Ill. App. 3d 818, 447 N.E.2d 1029.) We have reviewed the record in this case and find that the evidence supports the verdict. The State's evidence as to the comparison of the photographs taken before and after the three incidents indicated that the damage was virtually identical, and we believe that the jury could reasonably have inferred that no accident occurred on either July 13, 1980, or July 26, 1980. While defendant denies that he was involved in

the Ryder incident, both Officer Smith and Earl Podolsky identified him as the individual who represented himself to them as Edward Stansbury, and the Ryder check was deposited in the savings account of his wife. We therefore reject defendant's contention that he was not proved guilty beyond a reasonable doubt.

■■ Defendant finally contends that the trial court abused its discretion when it sentenced him to consecutive four-year terms for each of the two theft convictions. In support of his contention, he first argues that consecutive sentences cannot be imposed for "offenses which were committed as part of a single course of conduct during which there was no substantial change in the nature of the criminal objective." (Ill. Rev. Stat. 1981, ch. 38, par. 1005—8—4(a).) Although testimony from the trial and from the sentencing hearing indicates that these offenses were part of a larger scheme of financial fraud, the two incidents did not constitute a single course of conduct within the contemplation of section 5—8—4(a). See *People v. Miller* (1983), 115 Ill. App. 3d 592, 450 N.E.2d 767, *cert. denied* (1984), 465 U.S. 1033, 79 L. Ed. 2d 701, 104 S. Ct. 1302; see also *People v. Lee* (1976), 41 Ill. App. 3d 502, 354 N.E.2d 543.

Defendant also argues that the protection of the public is not served by imposition of consecutive sentences on this defendant and, in support of his argument, refers us to *People v. Griffin* (1982), 113 Ill. App. 3d 184, 446 N.E.2d 1175. In *Griffin*, the court held that the record did not adequately show that the sentencing court was of the opinion that a consecutive sentence was necessary for the protection of the public. (Ill. Rev. Stat. 1981, ch. 38, par. 1005—8—4(b); see also *People v. Pittman* (1982), 93 Ill. 2d 169, 442 N.E.2d 836.) Here, the trial court heard testimony during the sentencing hearing that defendant was involved in numerous other incidents of the same type of financial fraud and expressed the opinion that defendant was a public nuisance and a danger to society. Under the totality of the circumstances here, we find no abuse of discretion in the imposition of consecutive sentences.

For the reasons stated, the convictions and sentences are affirmed.

Affirmed.

MEJDA, P.J., and LORENZ, J., concur.